## NILVA *v.* UNITED STATES.

No. 37.   Argued November 8, 13, 1956.—Decided February 25, 1957.

*Eugene Gressman* argued the cause for petitioner. With him on the brief was *John W. Graff.*

*Richard J. Blanchard* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Olney* and *Beatrice Rosenberg.*

MR. JUSTICE BURTON delivered the opinion of the Court.

In this case, a Federal District Court convicted an attorney of criminal contempt on three specifications for disobeying subpoenas *duces tecum,* and imposed a general sentence of imprisonment for a year and a day. Since the Government has abandoned two of the specifications, the principal questions are whether there is sufficient evidence to sustain the conviction on the third specification standing alone, and, if so, whether the case should be remanded for resentencing. For the reasons hereafter stated, we answer each in the affirmative.

In 1953, in the District Court of the United States for the District of North Dakota, petitioner, Allen I. Nilva,

was tried, with Elmo T. Christianson and Herman Paster, for conspiracy to violate the Federal Slot Machine Act, 64 Stat. 1134–1136, 15 U. S. C. §§ 1171–1177. Christianson was the Attorney General of North Dakota. Paster was the owner of several distributing companies located in St. Paul, Minnesota. Petitioner was an attorney in St. Paul, a brother-in-law of Paster, and an officer in several of Paster's distributing companies. The indictment charged that these three conspired, with others, to accumulate slot machines late in 1950 and transport them into North Dakota, where they were to be distributed and operated under the protection of Christianson, who was to take office as Attorney General of that State on January 2, 1951.

On the first trial, in 1953, a jury was unable to agree on the guilt of Christianson and Paster but acquitted petitioner. In 1954, in preparation for a retrial of Christianson and Paster, the same court issued subpoenas *duces tecum* No. 78, returnable on March 22, and No. 160, returnable on March 29. Each was addressed to the Mayflower Distributing Company, a St. Paul slot machine distributing corporation wholly owned by Paster. Each called for the production of records, for certain periods in 1950 and 1951, relating to transactions in slot machines and other coin-operated devices.[1] Each was served on Walter D. Johnson, secretary-treasurer of the company.

On the date set for trial, Paster, instead of producing the subpoenaed records, moved to quash the subpoenas

---

[1] Subpoena No. 160 commanded the corporation to—

"Come and bring with you all invoices, bills, checks, slips, papers, records, letters, ledger sheets, bookkeeping records, journals and copies thereof between, by or concerning Mayflower Distributing Company, made, entered, sent or received from July 1, 1950, through April 30, 1951, both dates inclusive, reflecting any and all purchases, sales, trades, exchanges or transfers, both domestic and foreign of any and all slot machines, flat-top or console, coin operated device, whether new or used with any persons, firm or concern."

on the ground that the company was wholly owned by him and that the subpoenas required him to furnish evidence against himself.   The motion was denied and, in response to the Government's request, the court ordered the subpoenaed records to be produced "forthwith." [2] Three days later, on April 1, petitioner, who was an attorney of record for Paster, appeared in court and stated that he was the company's vice-president appearing for it in answer to the subpoenas.   He said that "in response to this subpoena I personally, with the aid of people in the office force, searched all of our records in an attempt to comply with your subpoena and have brought all of the evidence I could to comply therewith."   However, when the Government asked for the records of purchases and sales of slot machines called for by the subpoenas, he stated that he had been unable to locate them and suggested that some of the company's records had been transferred to St. Louis in connection with a conspiracy case pending there on appeal.[3]

The trial court, being convinced, as it later stated, that petitioner was giving false and evasive testimony, issued

---

[2] This was pursuant to Rule 17 (c), Federal Rules of Criminal Procedure:

"Rule 17.   Subpoena.

.          .          .          .          .

"(c) FOR PRODUCTION OF DOCUMENTARY EVIDENCE AND OF OBJECTS.   A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein.   The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive.   The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys."

[3] See *Nilva* v. *United States*, 212 F. 2d 115, decided April 19, 1954. This related to Samuel George Nilva, not the petitioner herein.

an order reciting the failure of the officers of the company to produce the subpoenaed records and ordering all records of the company impounded by the United States Marshal. Many of the company's records in St. Paul were at once impounded and accountants from the Federal Bureau of Investigation promptly examined them. Among them were records of the company's purchases and sales of slot machines in 1950 and 1951. At the conspiracy trial on April 12, an F. B. I. agent named Peterson testified about those records from summaries he had compiled.

On April 15, the trial court found it apparent that petitioner's testimony "was evasive or false, or both," and ordered him not to leave its jurisdiction without permission. No further action was taken at that time "because it was the Court's desire that the jury [in the conspiracy case] should not learn of the affair during the trial, so that the defendants therein would not be prejudiced by it in any way."

On April 22, the jury found Christianson and Paster guilty of the conspiracy charged.[4] On the following day, the court directed petitioner to appear on April 27 and show cause why he should not be held in criminal contempt for having obstructed the administration of justice.[5] In three specifications, the court charged petitioner with—

"1. Giving false and evasive testimony under oath on April 1, 1954, upon answering, as vice-president of the Mayflower Distributing Company, subpoenaes duces tecum directed to [it] . . .

---

[4] See *Christianson* v. *United States*, 226 F. 2d 646.

[5] "Rule 42. Criminal Contempt.

. . . . .

"(b) DISPOSITION UPON NOTICE AND HEARING. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the

"2. Disobedience to subpoena duces tecum No. 78, directed to the Mayflower Distributing Company . . . in that the following articles were not produced, as required thereby:

"(a) Original ledger sheet reflecting the account of Stanley Baeder, November 1, 1950 through August 30, 1951;

. . . . .

"3. Disobedience to subpoena duces tecum No. 160 directed to the Mayflower Distributing Company, and disobedience to the order of the Court, made on March 29, 1954, directing the Mayflower Distributing Company to produce records forthwith, in the case of *United States of America v. Elmo T. Christianson and Herman Paster,* Criminal No. 8158, in that the following articles were not produced, as required thereby:

"(a) General ledger 1950;
"(b) General ledger 1951;
"(c) Journal 1950–1951;
"(d) Check Register 1950–1951; . . . ."

defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment." Fed. Rules Crim. Proc.

Authority to prosecute for criminal contempt is found in Rule 17 (g), Federal Rules of Criminal Procedure, and 18 U. S. C. § 401 (3).

At 10 a. m., on April 27, petitioner appeared as directed. The court gave his counsel access to the impounded records and postponed the hearing until 3 p. m. At that time, the impounded books and records were present on the trial table and petitioner took the stand in his own defense. He identified items (a), (b), (c) and (d) of the 22 listed in the third specification and introduced those records as his exhibits. Item (a) was the company's general ledger for 1950. It contained a record of sales of new slot machines during October 1950—January 1951; sales of used slot machines during July 1950—January 1951; and purchases of used slot machines during August 1950—January 1951. Petitioner admitted having previously examined the company's 1950 and 1951 general ledgers but said that he had not found evidence of slot machine purchases and sales. He also admitted that he had not examined 19 of the 22 items listed in specification No. 3. At the close of the hearing, over petitioner's objection, a transcript of the testimony of F. B. I. Agent Peterson, given at the conspiracy trial, was admitted in evidence in the contempt proceeding without opportunity for petitioner to confront him or cross-examine him in that proceeding.

After finding petitioner guilty of criminal contempt on each of the three specifications, the court gave him a general sentence of imprisonment for a year and a day. On June 3, it released him on bail but denied his motion to suspend his sentence and grant him probation.

The Court of Appeals affirmed the judgment, 227 F. 2d 74, and denied rehearing, 228 F. 2d 134. We granted certiorari. 350 U. S. 1005.

Although the District Court found petitioner guilty of contempt on each of the three specifications, the Government now concedes that the convictions on the first two are of doubtful validity and does not undertake

to sustain them. Consequently, we do not consider them here.[6]

This reduces the case to the charge that petitioner wilfully disobeyed the court's order to produce certain corporate records required by subpoena No. 160. On that issue, it is settled that a criminal contempt is committed by one who, in response to a subpoena calling for corporation or association records, refuses to surrender them when they are in existence and within his control. *United States* v. *Fleischman,* 339 U. S. 349; *United States* v. *White,* 322 U. S. 694; *Wilson* v. *United States,* 221 U. S. 361; and see *United States* v. *Patterson,* 219 F. 2d 659.

The Government rests its case on petitioner's failure to produce the records listed in the first four items set forth in specification No. 3, *i. e.,* the general ledger for 1950, the general ledger for 1951, the journal for 1950–1951, and the check register for 1950–1951. These are impounded records which petitioner introduced in evidence as his exhibits.[7] The first is the general ledger for 1950, shown by the list of petitioner's exhibits to include records of purchases and sales made during part of the

---

[6] The Government concedes also that the transcript of Agent Peterson's testimony at the conspiracy trial should not have been admitted in evidence in the contempt proceeding and does not rely on it here. This concession does not materially affect the Government's case under specification No. 3, because the books and records named in that specification were properly introduced by petitioner as exhibits in the contempt proceeding and speak for themselves.

[7] The parties stipulated that these exhibits would be a part of the record on appeal. Their contents are summarized in a list of exhibits which is included in a supplemental record, first introduced before the Court of Appeals. Although petitioner moved to strike out most of that supplemental record, he omitted from his motion all references to the pages containing this list and he has not objected to its presence in the record before us.

period called for by subpoena No. 160.[8] Petitioner admits having previously examined the first two items.

Petitioner was a "nominal" vice-president of the corporation; he rendered it legal and administrative services of many kinds; he was a brother-in-law of its sole owner and president; he appeared in court as its official representative in answer to the subpoenas and represented that he had brought with him all of the subpoenaed records that he and the office force could find.

The subpoenas had been served on the secretary-treasurer of the corporation, who, in turn, had entrusted to petitioner the duty of satisfying them. When peti-

---

[8] Among the records called for by subpoena No. 160 are "ledger sheets" reflecting purchases and sales of slot machines between July 1, 1950, and April 30, 1951. See note 1, *supra*. The list of exhibits shows that exhibit No. 1 includes Mayflower's general ledger for 1950 in which the—

Records indicate that "Sales—Bells New" (Slot Machines) [were] made as follows:

.        .        .        .            .

| | |
|---|---|
| October 1950 | $650.00 |
| December 1950 | 3,631.00 |
| January 1951 | 9,000.00 |
| total | $13,501.00 |

Sales—Bells used (slot machines)

.        .        .        .            .

| | |
|---|---|
| July 1950 | $1,249.00 |
| August 1950 | 3,160.00 |
| September 1950 | 2,125.00 |
| October 1950 | (1,140.00) |
| November 1950 | 625.00 |
| December 1950 | 14,104.00 |
| January 1951 | 50,005.00 |
| total | $72,499.50 |

tioner appeared in court in response to the subpoenas, he did not claim either want of actual possession of the required records or lack of opportunity or authority to produce them. See *United States* v. *Bryan,* 339 U. S. 323, 333; *Wilson* v. *United States, supra,* at 376. Yet he failed to produce the vital corporate records which the Government promptly impounded. In our opinion, the evidence reasonably supports the conclusion that those records were in existence and were within petitioner's control.

---

The records further indicate that the following purchases were made:

"Purchases—Bells New" (slot machines)

.      .      .      .      .

"Purchases—Bells used" (slot machines)

.      .      .      .      .

| | | |
|---|---:|---:|
| August 1950 | $320.00 | |
| " 1950 | 400.00 | |
| " 1950 | 980.00 | |
| September 1950 | 990.00 | |
| " 1950 | 315.00 | |
| " 1950 | (80.00) | |
| November 1950 | 100.00 | |
| December 1950 | 10,620.00 | |
| January 1951 | 965.00) | |
| " 1951 | 3,815.00) | $11,960.00 |
| " 1951 | 7,180.00) | |

total $25,784.00

.      .      .      .

Exhibit No. 2 is described as a ledger containing, among other records, the Mayflower—St. Paul general journal March 31, 1951, to January 31, 1952, and general ledger February 1, 1951, to January 31, 1952.

Exhibit No. 3 is described as the Mayflower—St. Paul journal February 1, 1946, to January 31, 1953.

Exhibit No. 4 is described as the check register for Mayflower—St. Paul July 1, 1946, to January 31, 1955. Its contents are described as relating to purchases of used slot machines.

Petitioner contends that his testimony that he attempted, in good faith, to comply with the subpoenas disproves the existence of any wilful default, and presents an "adequate excuse" for his failure to comply under Rule 17 (g), Federal Rules of Criminal Procedure. However, his protestations of good faith were subject to appraisal by the court that heard them. It was the judge of his credibility and of the weight to be given to his testimony. *Lopiparo* v. *United States,* 216 F. 2d 87, 91. In our view, the trial court had a sufficient basis for concluding that petitioner intentionally, and without "adequate excuse," defied the court.[9] We, therefore, agree that the record sustains petitioner's conviction for criminal contempt under specification No. 3.

Petitioner claims that he was not allowed adequate time to prepare his defense. Under the circumstances of this case and in view of the wide discretion on such matters properly vested in the trial court, we think this claim is unfounded.[10]

Petitioner also contends that, as a matter of law, this contempt proceeding should have been heard by a judge other than the one who initiated the proceeding. Rule 42 (b), Federal Rules of Criminal Procedure, does not require disqualification of the trial judge except where

---

[9] Whether proof of a lesser species of intent will satisfy the requirements for a conviction of criminal contempt need not be decided here. See, generally, Moskovitz, Contempt of Injunctions, Civil and Criminal, 43 Col. L. Rev. 780, 793–796 (1943); Note, The Intent Element in Contempt of Injunctions, Decrees and Court Orders, 48 Mich. L. Rev. 860, 864–869 (1950).

[10] Petitioner was an attorney familiar with the case. He appeared in answer to the subpoenas on April 1; after the impounded records were produced, he was, on April 15, warned not to leave the jurisdiction of the court; the order for him to show cause why he should not be held in criminal contempt was issued on April 23, returnable on April 27; and on April 27 his hearing was postponed five hours to give his counsel extra time to examine the impounded records.

396

"the contempt charged involves disrespect to or criticism of a judge . . . ."[11] Concededly, the contempt here charged was not of that kind. And while there may be other cases, brought under Rule 42 (b), in which it is the better practice to assign a judge who did not preside over the case in which the alleged contumacy occurred to hear the contempt proceeding, such an assignment is discretionary. In the absence of a showing of an abuse of that discretion, petitioner's conviction on specification No. 3 should be sustained.

There remains a question as to petitioner's general sentence. It was imposed following his conviction on each of the three original specifications. Although the Government now undertakes to sustain but one of the convictions, it contends that petitioner's sentence should be left as it is because it was within the trial court's allowable discretion. We believe, however, that the court should be given an opportunity to reconsider petitioner's sentence in view of the fact that his conviction now rests solely on the third specification.[12]

Accordingly, petitioner's conviction for criminal contempt on specification No. 3 is affirmed but his sentence is vacated and the case is remanded to the District Court for reconsideration of his sentence.

*It is so ordered.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

This conviction for criminal contempt should be reversed and the case should be remanded to the District Court with directions that it be tried before some district judge other than the one who preferred the charges against

---

[11] See note 5, *supra.*

[12] Cf. *Yasui* v. *United States,* 320 U. S. 115, 117; *Husty* v. *United States,* 282 U. S. 694, 703.

the petitioner and then convicted him. There have probably been few cases in the annals of this Court where the proceedings below were afflicted with so many flagrant errors. The Government has confessed most of these errors, but contends that enough can be salvaged from the record to sustain the conviction.

Petitioner, who is a lawyer, was a vice president of the Mayflower Distributing Company. Apparently he served largely as a nominal officer and performed only minor functions for this company. He was indicted with the president of the company and another man on a charge that they had conspired unlawfully to transport gambling devices in interstate commerce. A jury acquitted petitioner but failed to reach a verdict on the charge against the other two defendants. Subsequently a new trial was ordered for these two defendants. Prior to this new trial, the Government procured the issuance of two very broad subpoenas that directed the Mayflower Distributing Company to produce a large number of its corporate records, which the Government anticipated might show illegal transactions in interstate commerce. These subpoenas were served on the company's secretary but since he was occupied elsewhere he asked the petitioner to produce the material demanded by the subpoenas. On rather short notice petitioner produced a substantial number of records in compliance with these orders.

However, the Government, believing that all of the company's records called for by the subpoenas had not been produced, examined petitioner under oath before the trial judge in an effort to determine the extent of his compliance. Petitioner testified that he had produced as many of the records demanded as he could locate by a diligent search; nevertheless the trial judge ordered that all of the company's records be impounded. Government agents took charge of these impounded records and examined them. The Government claims that this

398

material included books and documents called for by the subpoenas but not produced by the petitioner.

The trial judge issued an order under Rule 42 (b) of the Federal Rules of Criminal Procedure for petitioner to show cause why he should not be held in criminal contempt of the court. This charge of contempt was based on three specifications: (1) that petitioner had testified falsely and evasively when asked under oath whether he had produced all the materials called for by the subpoenas; (2) that he had failed to comply with the first subpoena by not producing five items; and (3) that he had disobeyed the second subpoena by failing to produce twenty-two items. Four days after this order was issued, a hearing on the contempt charge was held before the same trial judge who sat in the retrial of the two other defendants and who preferred the charge against the petitioner. The judge found petitioner guilty on all three specifications of contempt and sentenced him to one year and one day imprisonment. The Court of Appeals affirmed the judgment.[1]

The Government confesses that the conviction on the first two specifications of contempt cannot be sustained. As it concedes, there was not only insufficient evidence to support the charges made in these specifications but the trial court admitted and relied on evidence which was clearly incompetent. In addition, petitioner was denied his constitutional right to confront and cross-examine witnesses whose testimony was used against him. And in regard to the first specification alleging false and evasive testimony under oath, petitioner's conduct, at most, only involved perjury, a crime that cannot be punished by use of the contempt power.[2] Nevertheless, the Government would have us uphold the conviction and

[1] 227 F. 2d 74.
[2] *In re Michael,* 326 U. S. 224.

sentence below on the basis of the finding of guilt on the third specification alone, the alleged failure to comply with the second subpoena.

A fundamental premise of our criminal law is that the prosecution has the burden of proving beyond a reasonable doubt that the accused committed the offense charged. And this Court has repeatedly emphasized that a prosecution for criminal contempt should be treated the same as any other criminal prosecution in this respect.[3] Before petitioner could be found guilty of criminal contempt for failing to comply with a subpoena, the prosecution had the burden of showing beyond a reasonable doubt that he intentionally refused to obey the court's order by not producing the materials demanded even though they were available to him. In this case the record does not contain enough competent evidence for the trier of fact to find that petitioner intentionally refused to comply with the second subpoena or even that the books and documents demanded by that subpoena were available to him.

Only four of the twenty-two documents referred to in the third specification were introduced in evidence and, as

---

[3] *E. g., Michaelson* v. *United States ex rel. Chicago, St. P., M. & O. R. Co.,* 266 U. S. 42, 66 ("In criminal contempts, as in criminal cases, the presumption of innocence obtains. Proof of guilt must be beyond reasonable doubt . . . .") ; *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 444 ("Without deciding what may be the rule in civil contempt, it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt . . . .").

See also *United States ex rel. Porter* v. *Kroger Grocery & Baking Co.,* 163 F. 2d 168, 172. ("[W]e have examined the authorities with a view of ascertaining the essential elements necessary to be alleged and proven in order to justify a conviction for criminal contempt. It is plain that a defendant is entitled to all the protection afforded a defendant in an ordinary criminal case and that the burden is upon the government to establish his guilt beyond a reasonable doubt.")

the Government recognizes, the conviction must rest on petitioner's intentional refusal to produce these four documents. The only competent evidence in the record which even tends to support an inference that petitioner knew the location of any of these four documents or that they were accessible to him was his comment that he had "previously" examined two of them.[4]   But by itself this solitary ambiguous fragment is clearly insufficient to justify finding beyond a reasonable doubt that the records were available to petitioner at the time when he was supposed to comply with the second subpoena.   Since the prosecution offered no admissible evidence at the trial, this obscure remark constitutes the sole case on this point against petitioner.   It is the only shred of admissible evidence that the majority has been able to glean from the record.   On the other hand, petitioner testified that as far as he knew most of the company's records were stored in the basement of its office and that he had made a diligent search through these records in an effort to produce the material demanded by the subpoena.   And he was not the custodian of the company's records, but only a nominal officer.

Similarly there was almost nothing before the trial court which even suggested that petitioner intentionally refused to produce the records demanded.   He stated under oath that he was not trained in accounting and was not familiar with the company's accounting records.

---

[4] The transcript of the record gives the following colloquy:

"Q. [By petitioner's counsel] Have you examined Respondent's Exhibit 3 ?   [Exhibit 3 was one of the four documents introduced in evidence.]

"A. [By petitioner] Yes, sir, I have examined this record, as well as the others, and from my examination—no, let me say, I examined those other two records previously and was unable to find any evidence of slot machines—"

Petitioner's answer is ambiguous.   It does not indicate where or when the prior examination took place or under what conditions.

He repeatedly testified that he had attempted in good faith to comply with the subpoena. The Government contends that a prima facie case of intentional refusal can be made out circumstantially from such evidence as is contained in the record. But since the competent evidence does not even support an inference that petitioner knew the location of the four crucial documents or that they were accessible to him, it is hard to see how an intentional refusal to obey can be implied at all, let alone beyond a reasonable doubt.

The trial judge compounded his error in convicting petitioner on such a striking insufficiency of competent evidence by relying on inadmissible hearsay statements which were not subject to cross-examination. The Government introduced in evidence, over objection, a transcript of an FBI agent's testimony at a prior trial in which petitioner was not a party. The agent had testified that he found certain records and documents in the company's offices. Apparently some of these were papers that the second subpoena had ordered the Mayflower Company to produce. The FBI agent's testimony together with certain statements by petitioner did furnish some evidence that these papers were available to petitioner, but, as the Government confesses, this testimony was plainly inadmissible.[5] Nevertheless the record indicates that the trial judge relied on it in finding petitioner guilty. As a matter of fact he went so far as to say ". . . that in this proceeding there ought to be included any pertinent part of the record or the files in the preceding case because this contempt proceeding arose out of the [petitioner's] actions [in refusing to comply with a subpoena issued in the prior case]."

The judge's position was manifestly wrong. A trial for criminal contempt is a proceeding wholly separate from

---

[5] See *In re Oliver*, 333 U. S. 257, 273.

any prior trial out of which the alleged contempt arose.[6] A conviction for contempt in a Rule 42 (b) proceeding must stand on the evidence properly introduced in that proceeding. Where a trial judge bases his decision in part on evidence which although material is inadmissible the conviction cannot stand even though an appellate court might conclude after expunging the bad evidence that enough good remained to support the conviction. The defendant is entitled to a decision by the trial judge based on that judge's evaluation of the proper evidence. It is no answer to say that the trial judge could have found the defendant guilty solely on the good evidence. He did not and the defendant is entitled to a retrial. The danger of prejudice from inadmissible hearsay was particularly grave in this case since the admissible evidence before the trial court was so grossly inadequate.[7]

The erroneous admission of portions of the record from the earlier trial accentuated another impropriety in the proceedings below. I believe that it is wrong in a Rule 42 (b) proceeding for the same judge who issued the orders allegedly disobeyed and who preferred the charges of contempt on his own initiative and based on his own knowledge to sit in judgment on the accused. In essence, this allows a man who already believes that another person has disobeyed his command to act as both prosecutor and judge in a proceeding to "decide" formally whether that person disobeyed him and should be pun-

---

[6] *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 444–446, 451; *Hayes* v. *Fischer*, 102 U. S. 121; *New Orleans* v. *The Steamship Co.*, 20 Wall. 387; *Ex parte Kearney*, 7 Wheat. 38.

[7] In its footnote 6 the majority states that the four documents introduced in evidence speak for themselves. It is not clear what the majority means by this statement. The mere fact that they were before the trial court does not tend to show that their location was known to petitioner or that they were available to him. At most it only shows that they were in existence at the trial and permits an inference that they existed somewhere previously.

ished.    It is contrary to elemental principles of justice to place such power in the hands of any man.[8]    At the very least another judge should be called upon to try the contempt charges.    Here, besides issuing the orders allegedly disobeyed and then citing petitioner for contempt, the trial judge was intimately involved in earlier proceedings from which the contempt charge developed and in which evidence relevant to that charge was presented.    Under such circumstances he would have been superhuman not to have held preconceived views as to petitioner's guilt.

The record discloses several incidents which specifically indicate that petitioner was not accorded a fair trial.    At the outset, the judge informed the petitioner that the burden was on him to proceed.    This is completely inconsistent with the presumption of innocence which exists in favor of a person charged with criminal contempt. Rather, the prosecutor carries the burden of establishing beyond a reasonable doubt that the alleged contemnor committed the offense charged.[9]    The almost total absence of any attempt by the Government to introduce evidence at petitioner's trial in support of

---

[8] In *In re Murchison*, 349 U. S. 133, this Court held that it violated due process for a judge to try contempt charges which he had preferred while acting as a so-called one-man grand jury.    The Court, at pp. 136–137, declared:

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases.    But our system of law has always endeavored to prevent even the probability of unfairness.    To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. . . .    Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer."

In the present case we are not compelled to reach the question of due process since this Court possesses general supervisory power over the criminal procedures in lower federal courts.

[9] See footnote 3, *supra*.

the accusations of contempt indicates that it relied on the trial judge's personal knowledge of the case. And as the majority points out several times the trial judge repeatedly indicated prior to the trial that he believed that petitioner was guilty of false and evasive testimony—the offense charged in the first specification of contempt. There is nothing which suggests that he did not have similar preconceived views on the other two specifications.[10] Surely every defendant is entitled to an impartial trial by one who has not prejudged his case but instead decides only on the evidence introduced at the trial. Application of this simple principle is just as necessary in contempt cases as in others.

Under Rule 42 (b) of the Federal Rules of Criminal Procedure when the alleged contempt involves "disrespect to or criticism of a judge" that judge shall be disqualified. Rule 42 (b) contains no provision with respect to disqualification in other circumstances. The majority relies on this silence to reject petitioner's contention that the trial judge here should have stepped aside. But at most Rule 42 (b) only permits a negative inference that a judge who prefers contempt charges for violations of his orders and who is intimately involved in related proceedings bearing on these charges can sit in judgment on the alleged contempt. In any event, Rule 42 (b) is a rule promulgated by this Court and where it is not explicit we should not interpret it in a manner to deny a fair trial before an impartial arbiter. Even if the majority were correct in saying that an "abuse of discretion" must be shown before

---

[10] A further indication of the trial judge's attitude toward petitioner is found in the "supplemental record" prepared by the Government for the Court of Appeals. The judge is reported as stating at the conclusion of the contempt trial that had petitioner "been a defendant in the [trial of his two alleged coconspirators] as it was tried [the second time], I don't think he would have been so fortunate." The judge then imposed a harsh sentence on petitioner.

this Court will compel a judge to disqualify himself, the record in this case clearly shows that it was an "abuse of discretion" for the trial judge not to step aside.

If the preceding errors and improprieties are not flagrant enough, the Court of Appeals contributed additional error by relying on a so-called "supplemental record" to affirm the conviction. This "supplemental record" included material which was not introduced at the trial and which was not even made a part of the record on appeal by the trial judge. The Government now concedes that it was improper for the appellate court to rely on this material. But as its first opinion shows, the Court of Appeals referred to the "supplemental record" to support its conclusion that there was sufficient evidence for the trial judge to find that the papers called for were available to petitioner, that he failed to produce them and that this failure was in bad faith. And on rehearing the Court of Appeals added still further error. After conceding that there were grave doubts about the admissibility of the FBI agent's uncross-examined hearsay statements, it nevertheless stated that the conviction was not reversible because the contempt could have been prosecuted under the summary procedures of Rule 42 (a). But as the Government points out, petitioner could not conceivably have been convicted under that rule.

And there are even more matters tainting the proceedings below. For example, petitioner was rushed to trial with an unduly short period to prepare his defense to the contempt charge. He was informed of the specifications of contempt on a Friday and told to appear the next Tuesday for trial. Since the subpoenas were extremely broad and vague and the specifications involved a large number of documents petitioner faced a formidable task in preparing a defense. He had four days, over a weekend, to secure a lawyer and familiarize him with the case, to examine a great volume of records, to talk with those

having relevant knowledge about these records and to secure witnesses. And when at the trial his lawyer requested a reasonable continuance, the judge gave only a few hours respite.

This Court should not sanction a conviction where the whole proceedings below were riddled with so many basic errors of serious magnitude. Sending the case back for a new sentence, even if it turns out to be a smaller one, seems to me to fall far short of according this petitioner the kind of justice every defendant has a right to expect from our courts. While somehow there is an idea that procedural safeguards required in other criminal trials are not available in trials for criminal contempt, due process certainly requires that one charged with such contempt be given a fair trial before an impartial judge. Here petitioner is to be deprived of his liberty and perhaps his professional career without having received that essential prerequisite to justice.