UNITED STATES of America

v.

**Bernard GOLDFINE.**

UNITED STATES of America

v.

**Mildred PAPERMAN.**
**Cr. No. 58-208, 58-209.**

United States District Court
D. Massachusetts.

Dec. 19, 1958.

Motions for Judgment of Acquittal or for New Trial, Reduction of Sentence and Bail Dec. 26, 1958.

16. Cf. La Bourgogne, supra, 2 Cir., 86 F. 475, 477.

17. E. g. The Santiago, supra.

18. E. g. The James Gray, supra.

19. Coyle Lines v. United States, supra.

94

Anthony Julian, U. S. Atty., by Andrew A. Caffrey and George H. Lewald, Asst. U. S. Attys., Boston, Mass., for the Government.

James W. Kelleher, Boston, Mass., for defendants.

WYZANSKI, District Judge.

1. On December 10, 1958, the United States filed petitions for attachment for criminal contempt against Bernard Goldfine and Mildred Paperman, and simultaneously Fred G. Pastore, Group Supervisor, Intelligence Division, Internal Revenue Service, filed against the same persons petitions for civil contempt. All these proceedings arose out of asserted violations of this Court's Interim Order of December 5, 1958. This Court heard the criminal and civil cases in one set of hearings, Tuesday, December 16, and yesterday, December 18.

2. This set of findings and conclusions relates solely to the attachments for criminal contempt, those proceedings having been finished, and argument had thereon. The attachments for civil contempt abide the presentation on Monday, December 22, 1958, of a written motion by defendants to amend the December 5 Order, and argument of counsel thereon, and on the other questions presented in the civil cases.

3. The history of the criminal cases begins in the summer of this year. Duly authorized agents of the Internal Revenue Service then started an investigation of the tax liability of five corporations in which defendant Goldfine was interested: Lebanon Mills Corporation, Lebandale Mills, Inc., George Mabbett & Sons Company, Strathmore Woolen Company, and Northfield Mills, Inc.

4. Defendant Goldfine, at all material times, has been president and treasurer of the first, second, and fourth of these companies, and has been president of the third. By virtue of such offices he has been in a position to exercise control over the records of those corporations. Even as to the minute books of those corporations, he has been in a position to direct the clerks of those corporations to produce them before an appropriate public authority. Defendant Goldfine has authorized defendant Paperman to produce before Internal Revenue Service authorities requested documents belonging to Strathmore Woolen Company. Moreover, she, at all material times, has been in control of the records of Northfield Mills, Inc., as well as the records of Strathmore Woolen Company.

5. On July 21, 1958, duly authorized agents of the Internal Revenue Service served administrative subpoenas upon appropriate officials or representatives of the five corporations. In the cases of the first four corporations, defendant Goldfine was the official named in the subpoenas. The subpoenas in each case covered a number of types of documents. For present purposes, it will be sufficient to say that the administrative subpoenas embraced, among other types of documents, these seven records, hereafter called *the seven listed records:*

(a) from Lebanon Mills Corporation, the accounts receivable ledger for the years 1952 through 1957 [See Exhibit AA].

(b) from Lebanon Mills Corporation, the accounts payable ledger for the years 1952 through 1957 [See Exhibits AB and AC].

(c) from Strathmore Woolen Company, the accounts receivable ledger for the years 1953 through 1957 [See Exhibit E].

(d) from Strathmore Woolen Company, the accounts payable ledger for the years 1953 through 1957 [See Exhibit D].

(e) from Strathmore Woolen Company, the cancelled checks for the years 1953 through 1957 [See Exhibit F].

(f) from Northfield Mills, Inc., the accounts receivable ledger for the fiscal years ending April 30, 1953 through April 30, 1957 [See Exhibit T].

(g) from Northfield Mills, Inc., the accounts payable ledger for the fiscal years ending April 30, 1953 through April 30, 1957 [See Exhibit U].

6. To avoid any suggestion of unfairness, it should be specifically stated and emphasized that the administrative subpoenas called for surely more than half a ton of documents, covered many years besides those listed above, and were cast in terms of undifferentiated generality. The reason that this opinion concentrates on the aforesaid seven records is because with respect to them the evidence is so clear that they command an inevitable conclusion. The only reason to refer to other documents is to see whether for some reason the facts that those other documents were covered by administrative or judicial subpoenas, or were produced by defendants in response to such subpoenas, furnishes some exculpation, excuse, or mitigating circumstance for the defendants' failure to produce one or more of the seven listed records.

7. After the administrative subpoenas were served, the corporations named therein, through appropriate officers and counsel, requested the Internal Revenue Service representatives not to insist on production at the Service's offices at 55 Tremont Street, Boston, in accordance with the terms of the subpoenas, but instead to examine the records at Kneeland Street. As a matter of convenience, the I.R.S. representatives did not press for

immediate compliance with the subpoenas.

8. During the summer they examined the records at the Kneeland Street offices of defendant Goldfine. In August or thereabouts each of the seven listed records was personally observed by at least one of the I.R.S. representatives. For example, Agent William L. Donovan examined the Northfield Mills, Inc. accounts receivable ledger and accounts payable ledger, and indeed saw included in their bindings a Yale Wool Waste Co. account which was not so included at the time these ledgers were subsequently offered in evidence to this Court by the defendants. [See the portions of Ex. V read into evidence during the re-direct examination of William L. Donovan.] It was during this same summer season that Agent Patrick J. Mullens observed duplicate deposit books, cancelled checks, and check book stubs of Lebanon Mills Corporation, which have never been produced in response to this Court's Interim Order.

9. After this examination at the Kneeland Street offices, Pastore determined to require compliance with the administrative subpoenas.

10. On November 5, at Pastore's instruction, Agent James P. Barry made a formal demand for the Lebanon, Lebandale, and Strathmore records. Defendant Goldfine said that the accountants were working on the books. Barry then talked to defendant Paperman about other corporate records, and received a similar answer.

11. Thereupon, in what is known on our docket as Case E.B.D. 58–81–W, on December 3, 1958, Pastore filed a petition for enforcement of the aforesaid administrative subpoenas. December 5 this Court held a hearing. On the same day, December 5, this Court issued what it entitled as Interim Order. The defendants' counsel admit that this Order was duly served on the defendants. This Order covered the seven listed records and also a great many other documents, —indeed so many that they certainly would weigh over 1300 pounds and would require a cubic container of at least 6 feet on a side.

12. The seven listed records, however, were plainly described in this Court's Interim Order. No one, either before the order was issued, when it was issued, or at any time before the second day of the present contempt hearing (that is, yesterday, Thursday, December 18) ever suggested to the Court that the Interim Order failed clearly to demand production of these seven listed records or was burdensome or invalid because these seven listed records were kept in loose leaf binders in which there were *on some (but not all) of the detachable pages* entries covering current 1958 items which were not embraced within the court's subpoena. And this omission becomes more significant in view of this Court's specific warning on December 5, the day it issued the Interim Order, that defendants, if they failed to comply would be held accountable in proceedings for both civil and criminal contempt.

13. Following the entry of this Court's Interim Order which required production of the seven listed records as well as many other records before the Internal Revenue Service at 55 Tremont Street, by noon on Monday, December 8, 1958, the present defendants sought to appeal to the Court of Appeals. That Court granted a stay until 3 P.M. on December 8, and then denied the appeal for lack of jurisdiction.

14. Neither on Friday, December 5, nor on Monday, December 8, nor at any other time did defendants file in this or any other Court any motion to defer the time of production of records on the ground that compliance was physically impossible.

15. From the evidence submitted in this criminal case, it appears that defendants delivered approximately 1300 pounds of material to the I.R.S. at 3 P.M. on Monday, December 8, and that though they delivered some minor items in the next few days, they did not deliver to the I.R.S. the seven listed records until 1:30 P.M. on Thursday, December 18. Moreover, they made this delivery only

after their counsel had first offered them as exhibits in this Court, and this Court had commented that such delivery was not a compliance with the Interim Order. On all the evidence, this Court finds that there was no physical impossibility, nor any impracticability, nor any substantial inconvenience which interfered with the delivery to the I.R.S. at 3 P.M. on Monday, December 8, 1958, of the seven listed records. Even more clearly there was no interference of any kind with delivery on Tuesday, December 9, 1958, or on Wednesday morning, December 10, 1958.

16. Late on Wednesday afternoon, December 10, 1958, the United States filed against the two defendants separate petitions for attachment for criminal contempt. In 58–208–W, Count One alleged the wilful failure of defendant Goldfine to produce, in accordance with the Interim Order, the first two of the seven listed records, as well as other items. Counts Two and Three related to other matters. In 58–209–W Count One alleged the wilful failure of defendant Paperman to produce, in accordance with the Interim Order, the third, fourth, and fifth of the seven listed records, as well as other items; and Count Two alleged the wilful failure of the same defendant Paperman to produce, in accordance with the Interim Order, the sixth and seventh of the seven listed records.

17. This Court scheduled a hearing for Tuesday, December 16, 1958. No postponement was sought.

18. The Government moved to quash a subpoena which defendants had served on Pastore on Monday afternoon, December 15, requiring him to produce everything which defendants had in fact delivered up to 4:25 P.M. December 15, 1958, to the I.R.S. This Court granted the motion. But the Government agreed that in fact somewhat over 1300 pounds of records had been delivered.

19. During the first day of testimony, December 16, 1958, the Government offered Pastore and half-a-dozen of his subordinates who testified as to the investigations they had conducted and the observations they had made. Defendants sought permission to examine the inter-office or departmental reports which the several witnesses had made. The Court granted this permission in full. Defendants' counsel examined most of these reports during 6 hours on Wednesday, December 17, 1958, on a day when the Court recessed to allow such examination. Defendants' counsel examined the balance of the reports (which, pending a ruling by this Court, the Government had temporarily withheld) between 1 P.M. and 3 P.M. on Thursday, December 18, 1958, when again the Court recessed to allow such examination.

20. In the course of the cross-examination of the I.R.S. agents, the defendants' counsel themselves introduced the seven listed records, Exhibits AA, AB, AC, E, D, F, T, and U (AB and AC, being two parts of what this opinion calls one record).

21. Defendants' counsel admitted that they themselves had seen these records, and labeled them, at least as early as Monday, December 14, 1958.

22. The records when offered in court were shown not to be bound books with stitched pages, but loose leaf folders containing pages clamped together by posts that were readily unclamped or unscrewed. Moreover, it appeared that most of the pages had entries all of which antedated 1958, but that some of the pages had entries for periods of time both preceding and including 1958, and perhaps a few of the pages had entries only for 1958. Counsel conceded that the pages were susceptible of photostating, though no concession was made as to how promptly the photostating could have been done. Finally, counsel conceded that at no time before Thursday, December 18, had anyone drawn to this Court's attenion the fact that Exhibits AA, AB, AC, E, D, F, T, and U had within their four corners both records called for by the Interim Order and also records not so demanded, and that at no time had anyone proposed segregation of the two

types of records, photostating, partial surrender, or other accommodating techniques.

23. After the Government's evidence had concluded, and the cross-examination of the Government's witnesses had been completed, defendants' counsel, following two recesses requested by them, decided to leave the case to be decided on the evidence already before the Court. It should be noted that, despite an argumentative thrust by defendants' counsel suggesting that defendants' failure to produce the seven listed records might be due to advice of counsel, when this Court specifically commented that defendants had offered no evidence to support that argument, this comment did not lead defendants' counsel to take any action, or to make any reply, or to seek to re-open the case.

24. The facts having been recited, it now becomes appropriate to apply the relevant principles of law which have recently been re-stated in Nilva v. United States, 352 U.S. 385, 77 S.Ct. 431, 1 L.Ed.2d 415.

■ 25. It is, of course, elementary that these being criminal cases, the Government has the burden of proving beyond a reasonable doubt every constituent element of the crimes charged.

■ 26. It is also elementary that to warrant a conviction on these pleadings, which were filed late in the afternoon of December 10, 1958, the Government must prove beyond a reasonable doubt that the crimes had been committed, and that each constituent element existed, on December 10, 1958, before the crimes were charged.

■ 27. In a case of alleged criminal contempt for wilful failure to comply with a judicial subpoena or order addressed to a defendant requiring him to produce a record, that is, in the sort of case now at bar, the Government must ordinarily prove these six elements of the crime beyond a reasonable doubt: (1) that the Court issued an order for the production at a particular time and place of a record adequately described in the order, (2) that the defendant was served with (or otherwise knew of) the order, (3) that the record existed at the time the order was served, (4) that the defendant had control (or lawful power to acquire control) of the record, (5) that the defendant failed to produce (or cause the production of) the record, and (6) that the defendant acted wilfully.

28. In the case at bar the first two elements are so beyond dispute as not to require comment.

29. Defendants' counsel suggest that as to the third element, the Government has not shown that defendants knew on December 8, 9, or 10 that these seven listed records existed. But with respect to element 3, *as distinguished from element 6*, the Government need not prove that a defendant knew or should have known on the date a record was due to be produced that the record then existed. As to element 3 it is sufficient to prove beyond a reasonable doubt that the record existed on the date the order was served. And, it is incontrovertible that Exhibits AA, AB, AC, E, D, F, T, and U existed on December 5, 6, 7, 8, 9, and 10 just as surely as they existed on December 18 when defendants themselves offered the records in open court.

30. As to element 4, the Government proved that defendant Goldfine was president of Lebanon Mills Corporation. As such he had control of Exhibits AA, AB, and AC. The Government also proved beyond a reasonable doubt that defendant Paperman had actual control of Exhibits E, D, F, T, and U.

31. Item 5 is proved by the fact that defendants did not deliver the seven listed records to the I.R.S. until 1:30 P.M. yesterday, Thursday, December 18.

32. With respect to item 6 the Government proved wilfulness in several ways. It will be enough to recite that each defendant knew in August 1958 of the existence of such of the seven listed records as he or she has been required to produce; he or she had reported in November 1958 to Agent Barry that the record was being worked on by account-

ants; and he or she knew that records of that type were kept in an ordinary business office in Kneeland St. Thus each defendant knew on December 5 of the existence of the record which he or she was commanded to produce. Failure to produce promptly such a known and readily reached record is wilful defiance.

33. The fact that other records were supplied is irrelevant in this case. One can imagine a situation where a defendant was so continuously occupied in carting to the I.R.S. records actually supplied, that he had no second's pause in which to get hold of a particular additional record. This is no such case. Defendants were not continuously occupied until the afternoon of December 10 in supplying records. And they never asked for more time, or asserted that they were pressed, or applied for modification of the Interim Order.

34. Nor is it any excuse that the exhibits containing the seven listed records also contained other records irrelevant to this case. Often a court requires the production of an exhibit which has a combination of both relevant and irrelevant matter, or a combination of both matter required by the court for testimonial purposes and matter required by the subpoenaed person for business purposes. If the respondent to the subpoena believes a segregation is desirable or necessary, it is incumbent on him to propose the segregation or duplication of the exhibit. And usually a dozen techniques to that end are available and would be approved by a court. Here neither defendant proposed any such technique. Instead, he chose to fail to comply with the Interim Order, in so far as it covered these seven listed records.

35. What defendants' reasons were for refusing to respond with respect to these seven records this Court does not know. And it is no part of the Government's burden to prove these reasons. The Government need not prove that defendants did or did not consult counsel. The Government need not prove that defendants were or were not

abstracting from the loose leaf records pages that once were clamped into the record. All that the Government must prove is the defendants' wilful disobedience. And that the Government has shown beyond a reasonable doubt.

36. Moreover, there is no showing that either defendant had, in the words of Rule 17(g), Federal Rules of Criminal Procedure, 18 U.S.C.A., "adequate excuse" for his or her failure to comply with this Court's Interim Order of December 5 to produce the seven listed records.

37. This Court, therefore, finds and concludes that defendant Bernard Goldfine is guilty as charged in Count One, but is not guilty as charged in Counts Two and Three of Cr. 58–208–W, and that defendant Mildred Paperman is guilty as charged in Counts One and Two of Cr. 58–209–W. Both defendants shall appear at 10 A.M. Monday, December 22, 1958, in Courtroom 6, United States Courthouse, Boston to be sentenced for their respective criminal contempts committed in defiance of this Court's Interim Order of December 5, 1958, and the specific warning to them which accompanied the issuance of that Interim Order.

On Motions for Judgment of Acquittal or, in the Alternative, for a New Trial; Motions for Reduction of Sentence; and Motions for Bail.

I have before me four motions. The first two are entitled, "Motion for Judgment of Acquittal or, in the Alternative, for a New Trial." The second two are entitled, "Motion for Reduction of Sentence." Each pair of motions is addressed respectively to the case of United States against Bernard Goldfine and United States against Mildred Paperman. Both defendants are in court and have been since the beginning of the argument on these motions. There is no reason whatsoever why they should stand, but I am making it clear that the proceedings were in their presence and are in their presence. I shall deal first with the two motions for judgment of acquittal.

I do not find it necessary again to state the grounds upon which the convictions were entered and sentence pronounced. However, there were some points raised in Mr. Kelleher's argument and some others to which the Court has given its own attention in the last few days which I do believe ought to be incorporated in the record in those proceedings.

Mr. Kelleher has made reference to the breadth of the interim order of December 5. As I pointed out in the colloquy with him, whatever may be said of the edges of the order, the central part of it is crystal clear. It names with explicitness the seven records listed in my finding. That these records did exist in August, and did exist on Monday, the 15th of December, and on Thursday, the 18th of December, is abundantly proved. While I have not said that these records were worked upon each day, some other reader of the transcript might have inferred that the reference to these records as being in current use would have warranted a judge in finding that every single working day entries were being made, if required, in these current books. Moreover, I have already pointed out in my findings, that if the order were in any aspect too broad or vague, it still is the situation that no one called that quality to the Court's attention at any time before the 18th of December, in the middle of the criminal hearing.

I am most anxious to avoid any possible reflection upon the professional competence or integrity of Mr. Kelleher, for whom I have a very high regard. As Mr. Goldfine knows, Mr. Kelleher succeeded in persuading this court in Henderdorf against Goldfine, by the strength of Mr. Kelleher's argument, apart from any authority and merely on the basis of the moral position there advanced, to vacate a receivership. I could not pay a higher compliment to any lawyer than to agree with the moral strength of an argument which I think went beyond any adjudicated case and asked for action based upon counsel's and my view of what was fair, not what was required.

Unfortunately, however, Mr. Kelleher was brought into this case after the defendants had already, without the benefit of his counsel, done or failed to do those acts which have involved them in this criminal set of trials. No blame can be properly attached to Mr. Kelleher. He faced the evidence as it was without power to alter history.

In these cases this Court began by giving the clearest warning, that when it entered this Interim Order it intended to have compliance in accordance with the terms of the order. The Court stated publicly in a courtroom at the time that the order was issued and before it was even served, that if those to whom it was addressed violated the order they would suffer criminal and civil sanctions. When the violation was drawn to the Court's attention, the Court issued appropriate preliminary subpoenas or like process, indicating that the hearing would begin on Tuesday, December 16th.

At the outset the Court stated that the proceedings would involve both civil contempt and criminal contempt, which were charged against each defendant. Reference at that time was made to United Mine Workers v. United States, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884. On the strength of that citation the Court announced it would hear simultaneously the two cases against the two defendants, that is, a total of four cases. No objection was made by any counsel. Not until this moment—this afternoon— has anyone suggested that there was any possible doubt of the consolidation. Nor is it easy for me to see how there could be any question, for the same judge decides the four cases. How can it be more fair for him to have different days for hearing the civil and the criminal contempt actions? He is to be reminded, of course, that the burden of proof in the two types of cases is different; and Mr. Kelleher did not fail so to remind the Court.

Some reference has been made in the argument to the Court's comment on proceedings other than these four proceed-

ings which were consolidated. A fair reading of the record I hope will show, and a fair inspection of my mind would show, that I did not punish either defendant for anything except the matters charged in the pleadings currently before me. I merely meant to make it clear that there were no exculpatory circumstances but that these were experienced defendants who could not effectively argue to me that they were caught by surprise. What I was perhaps doing was making an anticipatory rebuttal to an argument never addressed to me.

My solicitude to be fair in this case I thought had been manifest when I pointed out that the two cases nearest on their facts to these cases—the Nilva case and the Brody case [Duffy v. Brody, D.C., 147 F.Supp. 897]—had each resulted in a sentence of one year, whereas I was imposing a sentence of three months. I would not want anyone to suppose that, directly or indirectly, I am charging any authority in Washington or elsewhere with political prejudice, now or in any other case. But I know that these defendants are politically well known. And my experience in dealing with a tax collector and a Congressman has led me to be particularly careful when people have political reputations not to allow either the Parole Board or the Court to be affected by those circumstances. And out of an abundance of fairness I at once made the sentences so short that they were the equivalent of one month less than what a parole board, absent a presidential pardon, could have done to reduce a one-year sentence.

I am not unmindful also, that in the civil contempt matter I proceeded with extraordinary care to guard the rights of the defendants. Of course, they were guilty of a civil contempt, as they were guilty of a criminal contempt, if the question was Were they guilty as of the date the pleadings were filed. I never passed upon that issue. I merely adjudicated, as the judgment in the civil contempt cases shows, that they were not guilty of civil contempt as of the date the hear-

ings concluded and the judgment was entered.

Argument was addressed to me, and not without persuasive force, that there were still records in the custody of the defendants, and that the failure to produce those records warranted further action in regard to the civil contempt so that the two defendants could be held beyond the three months unless they produced these additional records. And for this order the United States would . have been required only to meet the burden of a civil case, not the burden of proof beyond a reasonable doubt. But I did not issue the requested finding and order which the Government pressed for in the civil contempt cases. I left it to the parties, in the hope that, admonished and punished, they would not make it necessary for me further to imprison them.

I hope that what I have just said they appreciate, for it is a warning, an underlined warning, that this may not be their final prison sentence in this court if they do not comply.

I do want to say one more general thing. When charged with the failure to produce documents, every one of us, not only the defendants in this case, is bound to think of many facts which are hidden in documents. I am the last one to say that I want my closet fully open. And I know that no defendant wants his closet fully open. All of us have done things which we would rather not have spread on the record—this Court as well as these defendants. But I have been sitting here just one month short of seventeen years this day, and, if I have learned nothing else at this job, I have learned that when people are in difficulty with respect to tax and like matters and the Government wants to get hold of their records in accordance with statutory provisions, it is the wisest course to supply the records promptly and to make such adjustment as is possible. There are men who have thought otherwise and who in this courtroom have found not only that they were held liable

criminally for their tax delinquencies, but were ruined by the exposure of their relations with quite different persons, sometimes their church, sometimes their family, sometimes their friends. It is most unwise, generally speaking, to stand against the statutory authority and to do battle to preserve from inspection that closet which Congress has said the administrative agency may inspect. It is better to allow inspection and to hope for fairness, than to run the grave risks generally consequent upon doing battle in a hopeless cause.

I have not made any reference to a point which, of course, lurks in this case. I have acquitted the defendant Goldfine of two of the counts against him; and even if he and his counsel were most solemnly to offer to forego the benefits of that acquittal, I could not reopen those aspects of the judgment I have entered. The Constitution of the United States would stand athwart any attempt to put the defendant Goldfine in double jeopardy with respect to Count 2 and Count 3.

There are particular reasons why in this case it seems to be most important that there should be no doubt of the fairness of this tribunal. I hope that I have not either leaned forward or backward because of any attempt to involve me personally in any aspect of this matter. One can never be sure he is without bias, and the best one can do is to realize the risk of bias and try to avoid it. I have tried, and I hope I have succeeded.

Also, I am not unmindful that when a person of political consequence gets into difficulty, the whole community shows a sadistic spirit, and that there is a tendency to regard the criminal law more as an instrument of vengeance than as an instrument of fitting punishment, retribution, and deterrence. The fact that in this group of cases I have been more moderate, certainly, than in the Nilva case and in the Brody case the trial judges were, may indicate my awareness of the risk here that the defendants might have been prejudiced by an inflamed public opinion which knows nothing of the limits appropriate always for judges, and particularly appropriate in the light of the restricted issues presented to this Court under the pleadings. My effort has been to stay within these considerations.

Taking into consideration all these facts, I deny all four of the motions.

The Court will take a recess.

"Mr. Kelleher. May I say one further word, your Honor?

"The Court. Yes.

"Mr. Kelleher. We propose to file an immediate appeal, and I think we applied to your Honor for bail, and I want to be heard very briefly.

"The Court. Surely. I will hear you.

"Mr. Kelleher. I think there is a fee of $10 [handing document to Clerk].

"The Court. I don't know what you are talking about.

"The Clerk. Notice of appeal, your Honor.

"The Court. Oh, notice of appeal. All right. Notices of appeal are properly filed, I assume, but I have nothing to do with them as a judicial function.

"Mr. Kelleher. And these are motions for bail, may it please the Court [handing to Clerk].

"The Court. Well, these are motions of bail beyond that I have already allowed. I have allowed bail—

"Mr. Kelleher. Yes.

"The Court. —until the 7th of January; and I decline to allow bail beyond that date. I do not want to characterize the appeals. I merely say, that I believe I am following the spirit and the letter of the appropriate rules.

"Mr. Kelleher. May I be heard on that very briefly?

"The Court. Yes.

"Mr. Kelleher. I think that your Honor expressed your opinion on the

question of the pending appeal on pages 4 and 5 of the transcript of last Monday. Your Honor said: 'The reason I have selected that time * * *.' That is, the sentence to begin on January 7th—

'* * * is that I have no wish that you shall spend this season in jail, and I wish to give you an adequate opportunity to present the matter to the Court of Appeals, for I am going to deny you any bail pending appeal, for I see no legal question of significance which remains open in your case.'

"The Court. I think I said 'cases'.

"Mr. Kelleher. 'Cases'. My transcript says 'case'. I am going to suggest to your Honor that that is not the test.

"The Court. That is what?

"Mr. Kelleher. That is not the test of whether your Honor should grant bail or not.

"The Court. Have you the rule in front of you?

"Mr. Kelleher. Yes, I do, your Honor.

"The Court. Would you read it, aloud?

"Mr. Kelleher. I will read the present version of the rule, which was amended in 1956, and I think your Honor must have had in mind the former version of the rule. The present version of the rule says this. It is Rule 46, Subsection (a) (2) [18 U.S.C.A.] 'Bail may be allowed pending appeal or certiorari only if it appears that the appeal is frivolous or taken for delay.'

"The Court. Excuse me. It says 'may'.

"Mr. Kelleher. Oh, yes. I am not suggesting that your Honor must do it.

"The Court. Yes.

"Mr. Kelleher. But I am suggesting that the test is a little different from the test that your Honor expressed the other day. The form-er version of the rule was this. Same rule, same subsection. 'Bail may be allowed pending appeal or certiorari *only if* it appears that the case involves a substantial question which should be determined by the appellate court.'

"The Court. Is there a difference between 'substantial question' and 'frivolous'?

"Mr. Kelleher. Oh, there is a clear distinction between the wording, and that distinction has been dealt with in an opinion by Mr. Justice Frankfurter.

"The Court. I mean, dealing with this rule?

"Mr. Kelleher. Yes.

"The Court. Which case are you referring to?

"Mr. Kelleher. The case of Ward against United States [Ward v. United States, 76 S.Ct. 1063, 1 L.Ed. 2d 25].

"The Court. Ward?

"Mr. Kelleher. Ward.

"The Court. W-a-r-d?

"Mr. Kelleher. W-a-r-d.

"The Court. When was this?

"Mr. Kelleher. August 8, 1956.

"The Court. Is that an application to him as a single judge?

"Mr. Kelleher. I believe it is. This is for bail, an appeal before the Court of Appeals for the Second Circuit, in which there was an evasion of income tax.

"The Court. And that involved this difficult problem as to net worth?

"Mr. Kelleher. I don't know.

"The Court. Well, isn't that what the case is?

"Mr. Kelleher. The question before Mr. Justice Frankfurter in this particular case was a question as to whether bail should be granted.

"The Court. Yes, but I am trying to understand what type of problem was before him. [A pause.] Go

**104**

ahead, Mr. Kelleher. You can't be expected to know everything in the reports. Nobody does—not even the judge who decided it, no doubt!

"Mr. Kelleher. Mr. Justice Frankfurter points this out, and I think it is very relevant here [Reading]:

" 'The Government commendably acknowledges that the new Rule has made an important change. The Rule expresses a general attitude, the significance of which is that inasmuch as an appeal from a conviction is a matter of right, the risk of incarceration for a conviction that may be upset is normally to be guarded against by allowing bail unless the appeal is so based as to deserve to be condemned as "frivolous" or is sought as a device for mere delay.' [76 S.Ct. 1065.]

"The burden has entirely shifted by reason of the amendment to this Rule, your Honor. Now, the language formerly was 'bail * * * only if a substantial question'; now it is, 'unless the appeal is merely frivolous'. I suggest to your Honor, that whatever you may think of our points in this case, they are not frivolous, they are not intended merely for delay; and I ask your Honor, respectfully, to admit the defendants to bail.

"The Court. Has either of you anything to say, Mr. Caffrey?

"Mr. Caffrey. We want to say this, your Honor: that the statement of your Honor which—I don't have the statement in front of me—but a statement by the district court, that the district court can see no question of legal significance, I submit, is tantamount to a ruling by the district court, that the appeal in legal contemplation is frivolous. Whether you use the exact word 'frivolous' or not, we submit it translates out to the legal significance thereof.

"The Court. Mr. Kelleher has persuaded me, that the test under the amendment is different from the test before. If the issues were solely issues of substantive law I would have no hesitation in saying, that the contentions of the defendants are frivolous. But, with appropriate reserve but nonetheless sufficient firmness, Mr. Kelleher has made the point, that there may be a question raised as to the fairness of the trial judge. And I am unwilling to say that any question involving my alleged unfairness is frivolous. That is for someone else to decide.

"I will admit the defendants to bail pending appeal."

"Is $1,000 without security satisfactory to the Government?

"Mr. Caffrey. Yes, your Honor.

"The Court. That will be the bail pending appeal."

The Court will adjourn.