**Allen I. NILVA, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

No. 15224.

United States Court of Appeals
Eighth Circuit.

Nov. 10, 1955.

Rehearing Denied Dec. 21, 1955.
See 228 F.2d 134.

See also, 8 Cir., 226 F.2d 646.

John W. Graff, St. Paul, Minn. (Hoffman, Donahue & Graff, St. Paul, Minn. on the brief), for appellant.

Oliver Dibble, Sp. Asst. to Atty. Gen. (Warren Olney III, Asst. Atty. Gen., and William R. Mills, Asst. U. S. Atty., Bismarck, N. D., on the brief), for appellee.

Before SANBORN, COLLET and VAN OOSTERHOUT, Circuit Judges.

COLLET, Circuit Judge.

Allen I. Nilva was convicted of criminal contempt and appeals.

In October, 1952, Elmo T. Christianson, Herman Paster and Nilva were indicted by a Federal Grand Jury for conspiracy to violate the Johnson Act, 15 U.S.C.A. § 1172, prohibiting the interstate transportation of gambling devices. That case will be referred to as the Christianson case. It was charged that the defendants and other coconspirators conspired to transport gambling devices into North Dakota where they were to be operated under the protection of Christianson, who was elected Attorney General of North Dakota in November, 1950, and assumed that office on January 2, 1951. The three defendants were tried in March, 1953. Nilva was acquitted. The jury failed to agree on the guilt or innocence of Christianson and Paster. The date for the retrial of the latter was first set for March 22, 1954, and later reset for March 29, 1954. It was the Government's theory, which it sought to establish at the first trial and was preparing to prove at the second, that one of the important incidents of the conspiracy was an executed plan to stock-pile a large number of gambling devices of the slot machine variety at St. Paul, Minnesota, in November and December of 1950 and the early part of 1951, to be moved into North Dakota where they were to be operated after Christianson became Attorney General. The May-

flower Distributing Company was a Minnesota corporation wholly owned and controlled by the Defendant Paster. Its principal place of business was at St. Paul. Through it slot machines were bought and sold. Paster and others not involved in the North Dakota case had been indicted, tried and convicted in the United States District Court of Minnesota for violation of the Johnson Act involving the transportation of slot machines into the State of Minnesota. Some of the records of the Mayflower Company had been used as evidence in that case. In the latter part of February, 1954, when preparations for the second trial of Christianson and Paster were being made, the Minnesota case was pending on appeal. See Nilva v. United States, 8 Cir., 212 F.2d 115. That part of the records of the Mayflower Company which was used in the Minnesota case was on file in the Court of Appeals.

In preparing for the second trial of the Christianson case, in the latter part of February, 1954, the Government obtained a subpoena duces tecum directed to the Mayflower Company for the production, among other things, of its records pertaining to the stock-piling of slot machines during the latter part of 1950 and the early part of 1951, and the sale and distribution of those machines. Another such subpoena was issued March 22, 1954. The return date of the subpoenas was March 29, 1954, the day the second trial of the Christianson case was set at Bismarck, North Dakota. March 29, 1954, the Mayflower records were not produced. Instead, Paster filed a motion to quash the subpoenas. The motion was denied and forthwith subpoenas were issued. Whereupon, Paster's counsel stated that the records called for in the subpoenas would be produced. The trial commenced the next day, March 30th, 1954. On the second day of the trial inquiry was made by Government counsel concerning the production of the records and assurance was given by Paster's counsel that they would be produced the next day—April 1, 1954. On April 1, 1954, Nilva ap-peared in response to the subpoenas. He was vice-president of the Mayflower Company, regularly employed by that company as its attorney and in a business capacity. He was Paster's brother-in-law and, as noted heretofore, a former defendant in the case. Nilva produced some of the records of the Mayflower Company at that time. While the records he produced showed the purchase of some new slot machines, there were no records produced of the purchase and stock piling of used machines. Nilva was sworn as a witness and examined concerning the existence of other records showing purchases of slot machines. He swore that he had made a diligent search of the Mayflower records and that the records he produced were all of the records of purchases except the records which were on file in the United States Court of Appeals in the Minnesota case. The following is an illustrative portion of his testimony:

"Q. Well, did the Mayflower Distributing Company purchase used slot machines during the month of January, 1951? A. Well, now, I can't state whether they did or not. That is a matter that is now involved in the Appellate Court of the Eighth Circuit. You don't want me to answer that. That's a matter that is on appeal now and I don't think it's proper for me to answer that.

"Q. Well, do the records of the Mayflower Distributing Company, Inc., show the purchase of second-hand slot machines during the month of January, 1951? A. Now, Mr. Dibble, the records with reference to that matter have all been subpoenaed and are in evidence in the Appellate Court.

"Q. Can you answer the question? A. Well, I just answered it to the best of my ability. Any records with reference to those purchases—they are substantial, sufficiently substantial, I can assure you and they are in the Appellate Court."

Being convinced that the foregoing, and other testimony to the same effect, was not true and that there were additional records called for by the subpoena, not on file in the Court of Appeals, and which showed purchases of used slot machines during the period under inquiry, Government counsel requested an order impounding the records, that Federal Bureau of Investigation agents assigned to the case be permitted to examine the records and that those which might be found and which had been called for by the subpoenas be brought into court. The order was granted. The next day, four F.B.I. agents commenced the examination of the records at St. Paul. Many records were found which had been called for by the subpoenas and which were not on file in the Court of Appeals in the Minnesota case. Among them were records showing the purchase by the Mayflower Company, of 198 slot machines, 16 in November, 1950, 94 in December, 1950, 81 in January, 1951, and 7 in February, 1951, whereas the records produced by Nilva showed the purchase of only 78 slot machines between September 20, 1950, and December 29, 1950. As to sales, the records produced by Nilva showed the sale of 64 slot machines between November 16, 1950, and December 28, 1950, and none after January 2, 1951, the effective date of the Johnson Act, whereas the records impounded disclosed the sale of 17 slot machines in November, 1950, 278 in December, 1950, 526 during January, 1951, and one in February, 1951. More than 40 of those shown by the impounded records to have been sold subsequent to January 2, 1951, and not shown in the records produced by Nilva, were sold in North Dakota.

The trial of the Christianson case proceeded, it being necessary, however, for the court to recess for a day to enable the agents of the F.B.I. to complete their examination of the impounded records. As the evidence developed, it appeared to the trial judge that Nilva had testified falsely and, had failed to obey the subpoenas. On April 15, Nilva and the other attorneys in the Christianson case were called into the court's chambers and Nilva was instructed not to leave the jurisdiction of the court of North Dakota without permission. Since the Christianson case had not been concluded, the court impressed upon all present the necessity that the public and particularly the jury know nothing about any impending contempt proceeding against Nilva in order that the jury not be influenced thereby. At that time, on April 15, 1954, the court was informed in Nilva's presence that Nilva had consulted an attorney in St. Paul about the impending contempt proceedings.

In the course of the trial of the Christianson case, Agent Peterson of the F.B.I. prepared and testified from a memorandum he made from the impounded records which showed the slot machines purchased by the Mayflower Company during the period inquired of Nilva about on April 1, 1954. The testimony of Agent Peterson indicated the falsity of Nilva's testimony. Bearing upon the willfulness of Nilva's testimony and his knowledge of Mayflower's records, a former employee of Mayflower's, named James Christensen, testified in the Christianson case that shortly before the first trial of that case, when Nilva was a defendant, at Nilva's direction he, Christensen, a bookkeeper, deleted and falsified Mayflower's records in order to prevent those records showing two sales and deliveries of slot machines to North Dakota after January 2, 1951.

The jury returned a verdict of guilty in the Christianson case April 22, 1954. Thereafter, on April 23, 1954, the trial court issued an order under Rule 42(b) of the Federal Rules of Criminal Procedure[1] directing that Nilva appear on

---

1. "(b) Disposition Upon Notice and Hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal con-

April 27, 1954, to show cause why he should not be held in criminal contempt for obstructing the administration of justice by (1) giving false and evasive testimony, (2) disobeying subpoena duces tecum No. 78 (issued February 26, 1954) by failing to produce certain therein described records, and (3) disobeying subpoena duces tecum No. 160 (issued March 22, 1954) by not producing certain described records called for by that subpoena.

Nilva appeared with counsel April 27, 1954, and requested a bill of particulars stating what portion of his testimony of April 1, 1954, was false and evasive. The request was denied. Request was then made for more time to prepare for trial. An adjournment was taken until 3:00 p. m. that day, at which time the contempt hearing proceeded before the court. Nilva was found guilty on each of the three charges and judgment was entered sentencing him to imprisonment for one year and one day. From that judgment he appeals.

■ The first assignment of error is that there was no competent evidence to support the finding that false and evasive testimony was given. The competency of the evidence received and considered is the crux of the assignment, for if the facts heretofore stated were shown by competent evidence, the falsity of Nilva's testimony that there were no more records of purchases by Mayflower during the period in question except those on file in the Court of Appeals is obvious. It was the evidence adduced at the Christianson trial, and particularly that of Agent Peterson, which showed that Nilva's testimony was false. A transcript of Peterson's testimony was received in evidence at the contempt hearing. It was objected to on the ground that it was hearsay because Nilva did not have an opportunity to cross-examine Peterson. But Nilva was an attorney of record for the defendant Paster in the Christianson case. He says that he did not participate in the trial and did not sit at the counsel table. But no reason appears why he could not have done so if he had desired. The question is not raised as to whether the extent of his right to cross-examine Peterson as Paster's attorney would have been materially different than it would have been had Nilva been cross-examining the witness in his own contempt proceeding. Since Peterson was testifying in the Christianson case to what the voluminous records showed and that was the reason for considering his testimony in the contempt proceeding, there appears to be no material difference. Whether that be true or not, the fact remains that Peterson could have been called by Nilva for examination and the records were there at the trial, in the custody of the court, available to Nilva at his hearing for the purpose of showing any inaccuracies in Peterson's summarization of them. For that reason no possible prejudice could have resulted from the use of the summarization instead of offering the truckload of exhibits.

■ The challenge to the competency of the evidence adduced at the Christianson trial in the later contempt proceeding poses another question. May a trial court take cognizance of what transpires in the trial of the case in connection with which the contempt was committed when the criminal contempt hearing is later held, or must all of the incidents occurring in the previous trial, which show the contempt, be again proved in the

tempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to

admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment." Fed.Rules Crim. Proc. rule 42(b), 18 U.S.C.A.

contempt hearing? If the acts and conduct which establish the prima facie ground for the contempt charge are established in a proceeding to which the person charged with contempt is a party or of counsel, with adequate opportunity to know the facts and protect himself, there appears to be no sound reason why both he and the court should not be permitted to take cognizance of such evidence in the contempt proceeding without formally reintroducing that evidence. One of the cardinal distinctions between summary contempt proceedings and criminal contempt is that in the former all that is material takes place in the court's presence and no independent inquiry is necessary, whereas in criminal contempt the charge is of such a nature that that which may first appear to be contemptuous may be subject to satisfactory explanation to the extent of exculpation or mitigation. Bowles v. United States, 4 Cir., 44 F.2d 115; In Matter of Savin, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150. Complete fairness must be scrupulously observed to the end that one charged with criminal contempt may have full opportunity of explanation and defense, but there is no sound reason under circumstances existing in this case for requiring the reintroduction of evidence which the court has heard and the person charged has either heard or has voluntarily turned his back to keep from hearing.[2]

■ The foregoing generalizations should not result in distorting the present issue. The figures given by Peterson were mere summarizations and tabulations made from voluminous records under a well recognized rule of evidence excepting such hearsay testimony from the general rule excluding hearsay. Since the original records were available in the contempt proceeding, there is no reason why, under the circumstances here presented, Peterson's testimony was not equally admissible as a summarization of voluminous records in both the Christianson case and the contempt proceedings.

■■ The giving of false and evasive testimony does not in itself constitute contempt. The further element of obstruction to the court in the performance of its duty must exist. Ex parte Hudgings, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656; In re Michael, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30; Howard v. United States, 8 Cir., 182 F.2d 908; Blim v. United States, 7 Cir., 68 F.2d 484. But it is not necessary that the giving of false or evasive testimony must completely disable the court from functioning before the obstruction may be dealt with as a contempt. Howard v. United States, 8 Cir., 182 F.2d 908; United States v. McGovern, 2 Cir., 60 F.2d 880. Figuratively speaking, it is not necessary to turn a polecat loose in the courtroom to obstruct the court in the performance of its duty. Nilva says that no obstruction of justice resulted from his conduct. We do not agree. By his testimony he sought to convince the court that the records he produced and those which were in the Court of Appeals were the only records in existence relating to the subject matter he was examined about. He thereby sought to suppress as evidence other germane records, some of which were crucial to the Government's case. The fact that the obstruction which he interposed was overcome by the impounding of the records, their tedious and laborious examination and their transportation to the place of trial, does not make his conduct any less an obstruction. And his conduct did necessitate a delay in the Christianson trial.

■ It is asserted that there is no competent evidence to support a finding of failure, without adequate excuse, to obey the subpoenas. His failure to produce records called for by the subpoenas

---

2. In a Supplemental Record filed by the Government in this court, a number of references are made to portions of the record in the Christianson case. Nilva by motion seeks to have those references stricken. For the foregoing reasons that motion is denied.

was demonstrated by their subsequent production under the impounding order. There was ample justification for a finding of willfulness.

▉ It is asserted that the subpoenas were invalid in part because they were unreasonably broad, vague and indefinite, and constituted a fishing expedition. They are not subject to those charges. And another answer to this charge is that practically all of the records called for by the subpoenas were later found when the records were impounded and examined.

The contention that the finding of the court that Nilva's failure to comply with the subpoenas obstructed justice was not justified is untenable for the reason that his false and evasive testimony was an obstruction.

▉ In criminal contempt proceedings the defendant is presumed to be innocent, he must be proven guilty beyond a reasonable doubt, he cannot be compelled to testify against himself, he shall, if proceeded against under Rule 42 (b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., be given notice of the charge and the essential facts constituting the contempt charged, described as such, he shall be advised of the time and place of the hearing, allowed a reasonable time for the preparation of his defense, to procure counsel, to present evidence, and to be heard in person or by counsel. Some of these rights Nilva says were denied him. He says he was not given a fair trial. We find no justification for the charge. He claims the specification of the charge was not sufficiently definite. That claim is without merit. He contends that he was denied sufficient time to prepare his defense, was denied the presumption of innocence and denied the right to have his guilt established beyond a reasonable doubt or be acquitted. We find no justification for these contentions.

▉ The punishment imposed is described as grossly excessive. We are asked to modify and reduce it. The defendant had been an attorney for a number of years. As such he was fully cognizant of the result of his conduct and the effect it might and did have on the conduct of the administration of justice. As an attorney it was his duty to promote, not to obstruct and hinder, the administration of justice. Those considerations the trial court had in mind when the punishment was fixed. Absent an abuse of discretion, the punishment fixed by the trial court will not be disturbed. Conley v. United States, 8 Cir., 59 F.2d 929. We find no justification for finding such abuse.

The judgment is affirmed.