## IN RE APPLICATION FOR DISCIPLINE OF ALLEN I. NILVA.

### 123 N. W. (2d) 803.

### October 11, 1963—No. 38,430.

*Glen P. Powrie* and *David W. Nord,* for petitioner.
*Gordon Rosenmeier, Phillip J. Klein,* and *Irving M. Frisch,* for respondent.

PER CURIAM.

On March 11, 1961, a petition and accusation was filed in this court by the Practice of Law Committee of the Minnesota State Bar Association, wherein disbarment or other disciplinary action was sought against Allen I. Nilva, an attorney at law of the State of Minnesota, hereafter referred to as respondent. The petition alleged that on or about April 1, 1954, Allen I. Nilva, as vice president of Mayflower Distributing Company, a Minnesota corporation, appeared in the United States District Court for the District of North Dakota in response to two subpoenas issued in the case of Christianson v. United States,[1] requiring the Mayflower Distributing Company to produce for examination its records pertaining to the purchase of slot machines for the months of January through April 1951; that he had testified that he had searched the records but had been unable to find those certain items; and that such testimony was false and untrue. It was further alleged that on April 27, 1954, Mr. Nilva was convicted of criminal contempt in the United States District Court by reason of his acts and false testimony, which conviction was affirmed by the United States Court of Appeals for the Eighth Circuit and by the United States Supreme Court; that on January 14, 1960, he was disbarred from the practice of law before the United States District Court for the District of Minnesota by reason of his acts and conduct as alleged.

---

[1]Christianson v. United States (8 Cir.) 226 F. (2d) 646, certiorari denied, 350 U. S. 994, 76 S. Ct. 543, 100 L. ed. 859.

On April 25, 1961, respondent interposed and filed his answer to the petition, setting forth his defenses to the accusations made therein. He alleged that he had appeared in the United States District Court for the District of North Dakota in the action described in the petition and had testified, under oath, that with the assistance of office employees of the Mayflower Distributing Company he had made a thorough search for the records required to be produced by the subpoenas, but had been unable to find them; that his testimony was not false or made with any corrupt intent. He admitted that he had been convicted by the United States District Court on three specifications of criminal contempt, and that such conviction had been affirmed by the United States Court of Appeals for the Eighth Circuit,[2] but alleged that said conviction was affirmed by the United States Supreme Court as to only the third specification, the government conceding that there was not sufficient evidence to sustain the conviction on the first and second specifications.[3] He alleged that as to his disbarment, the order therefor had provided that after 5 years he could apply for readmission to practice in such court.

He further alleged that the accusations in the petition failed to state a charge of misconduct upon which the relief prayed for therein could be granted; that the proceedings were not commenced within 2 years of the date of the alleged misconduct or within 1 year after discovery thereof, but had been commenced 6 years 11 months 28 days after the alleged misconduct, and that by reason of such delay respondent has been deprived of a fair opportunity to meet the accusations; that no allegations of misconduct either prior to or subsequent to April 1, 1954, have been made against him, and that since he has practiced law in Minnesota since September 24, 1935, without complaint otherwise, the conclusion is warranted that in the future he will discharge his professional responsibilities with fidelity and in accordance with recognized standards of ethics.

On March 12, 1962, the matters involved in these proceedings were referred by this court to the Honorable C. A. Rolloff, judge of the eighth judicial district, for the purpose of receiving evidence and thereafter submitting to this court findings and recommendations based thereon. The parties to the proceedings submitted evidence to the referee at a hearing in St. Paul commenced May 1, 1962. On February 7, 1963, on the basis thereof, the referee made findings of fact and recommendations to this court as follows:

---

[2]Nilva v. United States (8 Cir.) 227 F. (2d) 74.

[3]Nilva v. United States, 352 U. S. 385, 77 S. Ct. 431, 1 L. ed. (2d) 415, rehearing denied, 353 U. S. 931, 77 S. Ct. 716, 1 L. ed. (2d) 724.

"1.

"Allen I. Nilva is an attorney duly licensed to practice his profession in the State of Minnesota. He was admitted to the Bar in 1935 and has practiced his profession ever since in the City of St. Paul, except for four years of military service. He received an honorable discharge and his service ratings were superior. At the time of his discharge he was Staff Judge Advocate to General Raymond A. Wheeler in the Southeast Asia Command Headquarters. He is now 50 years of age. He has never married. He lives with his widowed mother.

"2.

"The Mayflower Distributing Company is a Minnesota corporation and at the times in question herein was engaged in the purchase, sale and operation of various coin-operated vending machines, amusement devices, slot machines and other types of machines used and useable for gambling. Herman Paster was the sole stockholder of said corporation. Paster is now deceased. Allen Nilva was a brother-in-law of Herman Paster. In 1946 Allen Nilva suspended his private practice and became a full-time employee as attorney of the Mayflower Distributing Company and other Paster enterprises. His work was mainly in connection with real estate transactions. He was vice-president of the Mayflower Distributing Company during the times here in question, but he claims he was only a nominal officer.

"3.

"The so-called Johnson Act, 15 U.S.C.A., Section 1172, prohibiting the transportation of gambling devices in interstate commerce under certain conditions became effective on January 2, 1951. On October 7, 1952, Herman Paster, Elmo T. Christianson and Allen Nilva were indicted in the United States District Court for the Fourth District of North Dakota upon a charge of conspiring to violate the Johnson Act. The case was tried in March 1953. Nilva was acquitted and the jury disagreed as to the other two defendants. A second trial was had in March 1954 as to Paster and Christianson and they were then convicted. The convictions were affirmed by the United States Court of Appeals for the Eighth Circuit. 226 F. 2d 646. The present proceeding arises out of Allen Nilva's conduct in connection with the second trial.

"4.

"Prior to the first trial Paster, the Mayflower Distributing Company, and one Samuel Nilva had been convicted in the United States District Court for the Fourth Division of Minnesota of transporting gambling devices in interstate commerce. Samuel Nilva was also a brother-in-law of Paster. The convictions were appealed to the United States Court of Appeals for the Eighth Circuit and were affirmed on November 1, 1955. 212 F. 2d 115. This is referred to as the Minnesota case.

"5.

"In the second trial in North Dakota the government sought to establish as one incident of a conspiracy that the defendants stockpiled slot machines in St. Paul for the purpose of transporting them to North Dakota after Christianson had been elected Attorney General for the State of North Dakota. A subpoena duces tecum, No. 78, was issued at the request of the government, directed to the Mayflower Distributing Company, and served on Walter Johnson, secretary-treasurer, on March 1, 1954 in St. Paul. This subpoena was returnable on March 22, 1954 and required the production of 'All originals and copies of all books, records, letters, memoranda and papers of the above-named company (Mayflower Distributing Company) concerning or pertaining to transactions or dealings with (16 named individuals in the State of North Dakota) made, entered received, prepared, corrected or sent from November 1, 1950, through August 30, 1951, both dates inclusive, including but not limited to:

" '(1) All invoices, freight bills, cancelled checks concerning the shipment of merchandise, parts or units of coin-operated amusement devices or gambling devices.

" '(2) All letters, bookkeeping records, receipts or cancelled checks, notes or mortgages or agreements or records of payments from, to or between the above-named individuals and Paster Distributing Company, Mayflower Distributing Company and Progress Finance Company.'

"A second subpoena duces tecum, No. 160, was issued at the request of the government, directed to Mayflower Distributing Company, and served upon Walter Johnson, secretary of said company, on [March] 25, 1954 in the City of St. Paul. This subpoena was returnable on March 29, 1954 and required the production of

" 'all invoices, bills, checks, slips, papers, records, letters, ledger sheets, bookkeeping records, journals and copies thereof between, by or concerning Mayflower Distributing Company, made, entered, sent or received from July 1, 1950, through April 30, 1951, both dates inclusive, reflecting any and all purchases, sales, trades, exchanges or transfers, both domestic and foreign of any and all slot machines, flat-top or console, coin operated device, whether new or used with any persons, firm, or concern. The records demanded in this subpoena are in addition to those previously subpoenaed.'

"Allen Nilva became familiar with each subpoena shortly after service was made upon Johnson.

"6.

"After each subpoena was served Nilva, Johnson and other employees made search of records called for by the subpoenas. On March 29, 1954 a motion to quash the subpoenas was denied. On April 1, 1954 Allen Nilva appeared before the United States District Court at Bismarck as vice-presi-

dent of Mayflower Distributing Company and in response to the subpoenas and produced certain records called for by the subpoenas. The government claimed that the records produced were not all that were required and particularly that the records did not show the purchase of used machines. Some claim was made by Nilva that some of the records and reports to the Attorney General were exhibits in the Minnesota case which was then pending on appeal in the United States Court of Appeals, Eighth Circuit. Nilva then represented to the Court: 'Some of the exhibits are here and those that are not here are in the Appellate Court at the present time.' This was not true. * * *

"The following proceedings were then had before the Judge of the United States District Court. Government counsel asked Nilva: '* * * but we want to know the sales and purchases prior to that.' (July 1951). Respondent answered and the record is as follows:

" 'MR. NILVA: Well, those were the only compiled records that we had. There were no other records of any kind; any other records, why, we turned over to the lawyers that we had, other investigating agencies that examined our records and that's all that we have. I brought them all down. I have the records and the files are in the office of John W. Graff and I got them from him. We had nothing else. I got everything that we had.

" 'THE COURT: Well, It's your position, then, that you do not have and the corporations do not have any of the records now referred to by Mr. Dibble?

" 'MR. NILVA: That's right, Your Honor. I brought all the records we have that were of a compiled nature of all the used machines and all other records are in the hands of the Appellate Court at the present time.

" 'MR. DIBBLE: He said of a compiled nature.

" 'MR. NILVA: Well, that's what they are. They are all compiled. That's all we have.

" 'MR. DIBBLE: You mean to tell me that in your office right now you don't have any way of telling what machines you bought during the month of January, 1951?

" 'MR. NILVA: Nothing other than what appears in the records that you have at the present time.'

"The statements made by Nilva were not true. * * * The record also shows the following:

" 'Q. Well, do the records of the Mayflower Distributing Company, Inc., show the purchase of second-hand slot machines during the month of January, 1951?

" 'A. Now, Mr. Dibble, the records with reference to that matter have all been subpoenaed and are in evidence in the Appellate Court. * * * Any

records with reference to those purchases * * * are in the Appellate Court.' "Nilva admits that the statements were inaccurate. * * *

"Nilva further represented to the Court: 'I could just say this, that in response to this subpoena I personally, with the aid of people in the office force, searched all of our records in an attempt to comply with your subpoena and have brought all of the evidence I could to comply therewith.' He did not bring all that was required by the subpoenas. * * *

"The record shows the following:

" 'Q. (By Mr. Dibble) Is there any record in the Mayflower Distributing Corporation today, in their possession today, which would reflect the purchase of second-hand coin machines, slot machines, during the month of February, 1951?

" 'A. I have made a thorough search to the best of my ability, with the assistance of others in the Mayflower Distributing Company, and have been unable to find any records of any purchase in the month of March. * * * Or February, 1951; * * *.'

"He again stated 'As far as I know and to the best of my knowledge and ability there are no records.' The following also appears:

" 'Q. Are there any records, documents, memoranda, papers, invoices in the possession of the Mayflower Distributing Company, Inc., or any officers thereof reflecting any purchases of slot machines or used slot machines during the month of April, 1951? * * *

" 'A. Well, in any event, I can say to the best of my knowledge there are no records whatsoever.'

"There were, in fact, such records in the office of the company. * * * Respondent concedes that his statements may have been careless. * * *

"7.

"The United States District Court made an order impounding the records of the Mayflower Distributing Company. An inspection of such records by an agent of the F.B.I. disclosed that there were, in fact, records in the office of the Mayflower Distributing Company which reflected purchases of used slot machines in the months of January and February, 1951. None of the records theretofore furnished by Nilva reflected any transactions concerning used slot machines during that period. * * *

"8.

"The statements made by Allen Nilva to the Judge of the United States District Court for the District of North Dakota were not made in good faith and were intended to deceive said Court.

"9.

"On April 27, 1954 the United States District Court for the District of North Dakota found Allen Nilva guilty of criminal contempt on the grounds: (1) Giving false and evasive testimony, (2) Disobeying Subpoena

duces tecum No. 78 and by failing to produce therein described records, and (3) Disobeying Subpoena duces tecum No. 160 by not producing certain described records called for by that subpoena. He appealed to the United States Court of Appeals for the Eighth Circuit and the conviction was affirmed on November 10, 1955. 227 F. 2d 74. He then appealed to the Supreme Court of the United States, and his conviction was there affirmed as to the third ground on February 25, 1957. The first two charges were in effect abandoned. 352 U. S. 385; 1 L. Ed. [2d] 415; 77 S. C. 431. A rehearing was denied by the Supreme Court on April 8, 1957. 353 U. S. 931; 1 L. Ed. [2d] 724; [77] S. C. 716.

"10.

"On January 14, 1960 Allen Nilva was disbarred from practice in the Federal District Court of Minnesota. The Order of Disbarment recites:

" 'It is charged and not denied, that Nilva impeded the administration of justice by suppressing evidence which would be material to the issues in said proceedings and by giving false testimony and failing to produce properly subpoenaed corporate records.'

"11.

"The present proceeding was commenced by service of the Petition upon Allen Nilva on March 28, 1961, which was approximately four years after the Petition for Rehearing on the contempt conviction was denied by the Supreme Court of the United States. It was one year and three months after the Federal Court disbarment. On October 6, 1961 a motion was made before the Supreme Court of Minnesota for an order disbarring Nilva on the basis of the disbarment in Federal Court. On March 9, 1962 the motion was denied. On March 12, 1962 the matter was referred to the undersigned as Referee. The commencement of these proceedings were belated and the prosecution has not gone forward with dispatch. But the respondent has not been prejudiced and the proceedings are not barred by laches.

"Except for the misconduct with reference to the proceeding in the United States District Court in North Dakota the respondent has been a man of good character.

"RECOMMENDATIONS

"1.

"It is the recommendation of the undersigned that Allen I. Nilva, the respondent herein, be not disbarred.

"2.

"It is further recommended that Allen I. Nilva be censured or reprimanded."

There is presently before this court respondent's motion for an order ap-

proving the first recommendation of the referee and rejecting the recommendation for censure.

In our opinion the findings of fact, made by Judge Rolloff, have support in the evidence. We agree with the recommendations he has made. However, we recognize the force of respondent's contention that the evidence relating to Finding No. 8 is meager and subject to different interpretations. His state of mind at the time he gave the testimony in the Federal District Court on April 1, 1954, cannot be determined with certainty. Even though we assume that the Mayflower Distributing Company had records in its possession disclosing purchase of slot machines in the first quarter of 1951, it does not necessarily follow that Nilva knew of the existence of such records at the time of his testimony. He has at all times contended that inaccuracies in his sworn statement made at that time were attributable to carelessness rather than a fixed intention to deceive.[4] We are reluctant to find malevolent intent in the absence of compelling evidence as to the mental state involved. Professional integrity is the most important attribute of the lawyer. An attorney who deliberately deceives the court is guilty not only of obstructing the administration of justice but also of subverting that loyalty to the truth without which he cannot be a lawyer in the real sense of the word. It is the seriousness and reprehensibility of the charge which deters us from accepting it in the face of respondent's denials[5] if a reasonable construction of the record permits another view.

---

[4] In response to interrogation by his attorney in the disciplinary proceedings, respondent testified:

"Q. * * * As a lawyer now, and with the benefit of hindsight that you have now, will you tell us whether or not any statement that you made to the court under oath or otherwise was a false statement, to your knowledge at the time you made it?

"A. No, it was not, sir.

"Q. * * * Would you tell us whether or not in the light of this hindsight that your statements were careless or were they made to what you thought was based upon adequate knowledge?

"A. I believe my statements may have been careless, and I think the most careless of them all is when I stated that I would answer in connection with the subpoena that was not served upon me. That's the greatest mistake I made, and there was no reason for it."

[5] Nilva testified:

"Q. * * * do you think now as you look back at it that you were justified in assuming that you knew enough to make the statements that you made?

"A. Yes, I thought that everything I was doing was proper. I didn't in-

There are considerations, we believe, which justify us in accepting Nilva's assurance that the testimony of April 1, though erroneous, was given in good faith. Considering his answers as a whole, we note qualifications and reservations as to his knowledge concerning the records of the Mayflower Distributing Company.[6] Planned intention to deceive is difficult to reconcile with these facts:

1. The subpoena was not directed to Nilva. He had no obligation to appear in the proceedings pending in Bismarck. While his name appeared on the pleadings as one of the attorneys for the defendants, he did not participate in that capacity.

2. Nilva himself had previously been charged with being a party to an illegal interstate shipment of slot machines and had been acquitted by a jury. For him to return to the same forum and involve himself in a willful

---

tend to deceive anyone, and I thought I was telling the truth to the best of my knowledge and information."

[6]Although it is difficult to convey the full sense of respondent's testimony without setting it out verbatim, the following answers are illustrative of the reservations made by him:

"Well, if you're going to ask me about the various methods of bookkeeping records, I can't give you an answer to that. * * *

* * * * *

"* * * I can't state whether they [the records of the Mayflower Distributing Company] do or not [reflect the purchase of any second-hand slot machines during the month of January 1951]. * * *

* * * * *

"* * * I am a nominal officer of the Mayflower Distributing Company and as far as bookkeeping records, I think somebody else in the corporation would be better qualified to answer that.

* * * * *

"I have made a thorough search to the best of my ability, with the assistance of others in the Mayflower Distributing Company, * * *.

* * * * *

"As far as I know and to the best of my knowledge and ability there are no records."

The following question and answer are significant:

"Q. (By Mr. Dibble) And in answer to the four months that I have asked you about, it is just to the best of your knowledge, you are not certain, is that it? Is that your testimony?

"A. Well, nobody is certain of anything. I want to qualify it as to the search that I have made and to the best of my knowledge."

and deliberate perjury implies a degree of irrationality wholly inconsistent with his background and character as described in the testimony.

3. Nilva had been notified by Special Agent Peterson, before he took the witness stand in the chambers of the presiding Federal District Court judge, that there were records essential to the government's case which were not included in those which Nilva had brought with him from St. Paul.[7] As Special Agent Peterson testified, in the proceedings then pending an at-

---

[7]Special Agent Peterson's testimony includes the following questions and answers:

"Q. When you saw Mr. Nilva and talked with him in the District Attorney's office at Bismarck he turned over the records that he had brought with him to you, didn't he?

"A. Yes.

"Q. ' And he had a suitcase full of them?

"A. Well, he had a briefcase with records.

\* \* \* \* \*

"Q. When you looked at that briefcase then you were aware that the general ledger was not there, the journal wasn't there, the purchase ledger wasn't there; you were aware of that, weren't you? \* \* \*

"A. Yes.

\* \* \* \* \*

"Q. Did you point out to him that that was what you expected under the subpoena and that they weren't there?

"A. Well, yes.

\* \* \* \* \*

"Q. You didn't call it to his attention that you expected the ledger or journal?

"A. I told him that the books of original entry and ledgers were missing.

\* \* \* \* \*

"Q. And what did he say?

"A. Well, he says this is what I have brought in answer to the subpoena.

"Q. That's all he said?

"A. Yes.

"Q. Did he tell you that he knew where the ledger was that was back in St. Paul?

"A. Well, it's my recollection that he indicated that he was not a book-keeper and this is what he brought, or this is what was prepared to bring.

"Q. And this is what was prepared to bring?

"A. Right.

"Q. And that he had brought it?

"A. Yes."

tempt was being made by the government to establish that during the latter part of 1950 and the first part of 1951 slot machines were being stockpiled in St. Paul, Minnesota, in anticipation of shipment to North Dakota. Such shipments constituted a violation of the Johnson Act, effective January 2, 1951. In light of Mr. Peterson's statement that the records were incomplete and that further search and examination of the records would be required by the Federal authorities, it must have been evident to Nilva and to the attorneys involved that the purpose of placing him under oath, when he was interrogated in the chambers of the Federal District Court judge concerning the documents brought by him to Bismarck in response to Subpoenas Nos. 78 and 160, was to place him in a position where severe penalties could be invoked if he testified falsely. He must have realized that the Federal authorities would examine the records of the Mayflower Distributing Company personally in an effort to secure the documents which he professed himself unable to produce and which the government considered essential to its case. Ethical considerations aside, it is difficult to believe Nilva would have asserted the nonexistence of records if he actually knew that they were in the files of the Mayflower Distributing Company, readily accessible to the Federal authorities.

4. If there was a willful and intentional effort on the part of Nilva, either in his individual capacity or in his role as nominal vice president of Mayflower Distributing Company, to obstruct the proceedings then pending in Bismarck by withholding evidence, some attempt, it seems, would have been made to conceal the entries made in the books of the corporation 4 years before the subpoenas were served. So far as it appears from the record this was not done. Special Agent Peterson acknowledged that in St. Paul on April 2 Walter Johnson, the secretary-treasurer of Mayflower Distributing Company, pointed out to him the place in the company's office where the specific records for which he asked were kept, and it was from these areas that the records were secured.

5. The fact that the government was interested in establishing the company's accumulation of slot machines in St. Paul, even though such accumulation might not be directly related to specific shipments, was a new evidentiary approach in the trial then pending. Nilva's probable familiarity with the earlier trial, where this factor was not emphasized, could in itself tend to be misleading.

6. The direction of the subpoenas was general and, if read in the broadest sense, involved a quantity of material that could not reasonably be collected on short notice. Special Agent Peterson testified that he and three associates, all trained in accounting, spent at least 2 days in assembling the records of the Mayflower Distributing Company which he considered to be within the scope of the subpoenas. The documents taken by

him from St. Paul to Bismarck included some 300 pounds of business entries and data.

7. As a result of Nilva's April 1, 1954, testimony in the Federal District Court in Bismarck, he was found guilty of criminal contempt upon three counts, one of which was for "giving false and evasive testimony under oath." Upon appeal to the United States Supreme Court, the Federal government abandoned this count and, in effect, conceded that there was no competent evidence to support it. While five of the members of the Supreme Court held that there was sufficient evidence to support a finding that Nilva had disobeyed Subpoena No. 160, a vigorous dissent was filed in which four of the justices held that even this count was without support in the evidence.

By the pleadings and the terms of the order of this court dated March 12, 1962, the reputation of Nilva during the years he has practiced in the courts of the State of Minnesota has been placed in issue. Except for the incident with which we are here concerned, his career as an attorney practicing in this state is without recorded blemish. Numerous responsible persons called as witnesses in his behalf described him as a man of good standing in the area. According to them, he has a background of community service and enjoys the confidence of the fellow practitioners who testified in his behalf. No one appeared or was called to contest these claims.

We conclude that the recommendations of the referee on the issue of disbarment should be accepted. More than 6 years elapsed between the time of the claimed misconduct in the Federal District Court and the institution of these proceedings. In the interval, Nilva has been found guilty on three counts of criminal contempt in that court, only one of which was sustained upon appeal to the United States Supreme Court, and that by a 5 to 4 decision. He has been disbarred from practicing in the Federal District Court subject to readmission upon his application after a period of 5 years commencing January 14, 1960.[8] We believe that disbarment from practice in

---

[8] On petition of the United States Attorney for the District of Minnesota that respondent be disbarred from further practice in the United States District Court for the District of Minnesota, hearing was held on January 8, 1960, upon charges that respondent impeded the administration of justice in the United States District Court by suppressing material evidence, by giving false testimony, and by failing to produce properly subpoenaed records. By amended answer respondent denies corrupt or fraudulent intent on his part in connection with the doing of the acts alleged. The January 8, 1960, order of the United States District Court recites that respondent did not deny that the acts impeded the administration of justice and that he had been guilty of contempt. It was ordered that he be disbarred in the Federal court with the

the State of Minnesota, where his conduct is and has been acceptable, would serve no useful purpose at this time.

Our disposition of this matter, however, is not to imply approval of the testimony given by Nilva on April 1, 1954, at Bismarck. He volunteered to respond to the subpoenas. His failure to produce the records was due to carelessness and to either an inadequate search by himself or unjustified reliance on the reported search of others. The fact remains that he gave testimony which for good reason apparently created the erroneous impression in the mind of the Federal judge that a thorough investigation had been made. This constituted heedlessness of the obligation which every citizen owes in responding to a court order, Federal or state, requiring him to produce evidence necessary for the administration of justice. Particularly is this true of one who has had the benefit of legal training and who, because of his position as a member of the bar, is expected to be particularly sensitive to the needs of effective judicial administration.

It is ordered and directed that the petition for disbarment be denied. Our censure of the inadequacies of Mr. Nilva's testimony on April 1, 1954, is implicit in this opinion.

MR. JUSTICE MURPHY took no part in the consideration or determination of the above proceedings.

MR. JUSTICE ROGOSHESKE took no part in the consideration or determination of the above proceedings.

---

provision that he might after 5 years apply for readmission to practice. In explaining his failure to contest the disbarment proceedings before the United States District Court, respondent states that after he had contested the contempt conviction in the United States Supreme Court he felt that further efforts would be fruitless. He relates that upon advice of his attorney and friends; because he was suffering from a heart condition at the time these disbarment proceedings were pending; and in the hope that disbarment would not be directed in light of the decision of the United States Supreme Court upon the appeal, he adopted a passive position after interposing his amended answer. By order of the Minnesota Supreme Court, dated March 9, 1962, summary disbarment of respondent on the ground of his disbarment in the Minnesota Federal District Court was denied.