In re Petition for DISCIPLINARY AC-
TION AGAINST Byron L. ZOTALEY,
an Attorney at Law of the State of
Minnesota.

No. C1–95–982.

Supreme Court of Minnesota.

April 19, 1996.

Marcia Johnson, Patrick R. Burns, Office of Lawyers Professional Responsibility, St. Paul, for appellant.

Michael J. Hoover, Minneapolis, for respondent.

## OPINION

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against respondent, Byron L. Zotaley, for submitting an insurance endorsement form taken from another client's file during an insurance arbitration and for failing to take remedial action after being informed that the arbitrator relied on the endorsement form as the basis for his decision. On appeal, the Director recommends that a six-month suspension is the appropriate discipline. We conclude that Zotaley's failure to inform opposing counsel that the insurance endorsement form was taken from another client's file, his submission of the form during arbitration, and his failure to take remedial action after learning that the arbitrator relied on the endorsement form as the basis for his decision warrant a six-month suspension.

Zotaley was admitted to practice in 1970 and has practiced for the past 26 years with a law firm located in Minneapolis, Minnesota. Prior to the present case, he has never been subject to a disciplinary investigation.

■ This disciplinary action arises out of Zotaley's representation of Rena Benkler, who was involved in an auto accident in 1990 in which she suffered personal injuries. At the time of the accident, Benkler and her husband owned two motor vehicles, both of which were insured with St. Paul Fire and Marine Insurance Company (the Company). Prior to retaining counsel, Benkler submitted a claim for no-fault wage loss benefits to the company. In her claim submission, Benkler made no representation as to whether she had stacking[1] coverage. If Benkler had stacking coverage, she would have been entitled to a maximum of $40,000 in no-fault wage loss benefits, payable at a maximum weekly rate of $500. If she did not have stacking coverage, her maximum no-fault wage loss benefits would have been $20,000, payable at a maximum weekly rate of $250. The Company began paying no-fault wage loss benefits in the fall of 1990 at the rate of $329.39 per week, indicating that the Company had determined Benkler was entitled to stacking coverage.

In January 1991, Benkler retained Zotaley to represent her in a personal injury action arising out of the auto accident. At that time, wage loss benefits and stacking were not at issue because the Company continued to pay Benkler $329.39 per week. On June 14, 1991, the Company determined that Benkler was medically able to perform her job and stopped paying wage loss benefits.

By letter dated October 19, 1992, the Company notified Zotaley that Benkler's maximum wage loss benefits were $20,000, indicating that the Company had concluded that Benkler did not have stacking. This letter marked the first time since the accident that the Company claimed Benkler did not have stacking. Zotaley then wrote a letter to Benkler asking her to "double check your coverage limits and let me know if you disagree with [the Company's] assertion" that she did not have stacking. Zotaley and Benkler had previously discussed whether Benkler had stacking, but Benkler had variously replied that it was possible that she had stacking because she and her husband always bought excess coverage, she did not know if she had stacking, and she did not think she had stacking.

In November of 1992, Zotaley filed a petition for arbitration of insurance coverage. At Zotaley's repeated urging, Benkler searched for but was unable to locate anything which would determine whether or not

---

1. "Stacking" is a term used in the insurance industry whereby an insured who insures more than one vehicle with an insurance company may, by paying an additional premium, purchase an endorsement to apply the coverage limits on both vehicles to one accident.

she had stacking. She then contacted her insurance agent to provide her with coverage information. In response, the insurance agent sent Benkler a summary of coverage, which Benkler gave to Zotaley. The summary of coverage did not indicate whether or not Benkler had stacking. However, the summary of coverage did refer to certain endorsements, but the endorsement forms were not included. Of particular relevance to this appeal is Form PPO567 (01–88) Personal Injury Protection (hereinafter PIP endorsement), which is an endorsement form concerning stacking.

Because Zotaley did not have Benkler's original PIP endorsement, he pulled a PIP endorsement with the identical number, PPO567 (01–88), from another client's file. The PIP endorsement form was a preprinted form which contained language, in type different from the other printing on the form, indicating that the policy provided for stacking coverage. At the time Zotaley obtained this form, he had no way of knowing whether or not this stacking language appeared in Benkler's actual PIP endorsement.

On February 13, 1993, Zotaley wrote to Benkler and specifically informed her that he had a copy of the PIP endorsement form from another client's file. Zotaley enclosed a copy of the form and again asked Benkler to check her records to see if she could locate the original form from her own records. At the same time that he dictated his letter to Benkler, Zotaley also dictated a letter to Thomas D. Jensen, counsel for the Company, and enclosed a copy of Benkler's summary of coverage. However, Zotaley did not inform Jensen in this letter, nor at any other subsequent point during the litigation, that the PIP endorsement form sent to Benkler had been taken from a different client's file.

The arbitration hearing took place on Monday, May 3, 1993. On the previous Friday, Zotaley submitted Benkler's statement of the case to the arbitrator and, as an attached exhibit, included Benkler's summary of coverage along with the PIP endorsement form. Zotaley did not reveal in his statement of the case that the PIP endorsement form was from the file of another client.

During the arbitration hearing, a representative of the Company produced a PIP endorsement form without stacking language and testified that this form was part of Benkler's insurance policy. Although Zotaley now had direct evidence before him indicating that Benkler might not have stacking, he used the endorsement form with stacking coverage in his cross-examination of the claims representative and failed to reveal during the arbitration that the PIP endorsement form was from the file of another client.

On May 13, 1993, the arbitrator issued his decision. Although the arbitrator did not state a reason for his decision, the fact that the total award exceeded $20,000 indicated that the arbitrator had concluded that Benkler had stacking coverage. Even though the awarded amount indicated that the arbitrator had mistakenly relied on the borrowed PIP endorsement form, Zotaley did not immediately inform the arbitrator of his mistake.

Sometime after the hearing, Zotaley visited with the arbitrator in an attempt to determine the basis for the arbitrator's decision. At this meeting, Zotaley did not inform the arbitrator that the PIP endorsement form was taken from another client's file. By letter dated June 25, 1993, Zotaley informed Benkler of the basis of the arbitrator's decision, noting that the arbitrator had given her the benefit of the stacking argument because the Company could not explain the source of the stacking language that Zotaley had produced.

In late 1993, Benkler terminated Zotaley's services and obtained successor counsel, who settled the lawsuit in mid–1994 for $21,000, $2,000 less than the amount that had been offered as settlement during Zotaley's representation of Benkler. Zotaley initiated a proceeding to collect the attorney fees that he felt he was entitled to for his representation of Benkler. During this proceeding, Benkler alleged that the PIP endorsement form had not been properly submitted during arbitration. The presiding judge informed the Director's office of Benkler's allegation, and the Director filed a petition for disciplinary action against Zotaley.

After a contested hearing, the referee concluded that Zotaley's submission of the PIP

endorsement form from another client's file to opposing counsel prior to arbitration, while misleading, did not constitute deception, misrepresentation, or a false statement of fact in violation of Minn. R. Prof. Conduct 4.1 or 8.4(c). The referee also concluded that Zotaley's claim in arbitration that Benkler was entitled to recover wage loss benefits based on stacking was not frivolous and did not violate Minn. R. Prof. Conduct 3.1. However, the referee did conclude that Zotaley's submission of the PIP endorsement form to opposing counsel and the arbitrator without explaining the source of the form, along with the deceptive nature in which the PIP endorsement form was submitted, violated Minn. R. Prof. Conduct 3.3(a)(4), 8.4(c), and 8.4(d). The referee also concluded that Zotaley's failure to take remedial action after learning from the arbitrator that the decision to grant stacking benefits was based on the PIP endorsement form violated Minn. R. Prof. Conduct 3.3(a)(4).

█ Because Zotaley timely ordered a transcript pursuant to Rule 14(e), Rules on Lawyers Professional Responsibility, the referee's findings are not conclusive. In disciplinary hearings, the standard of review for this court is whether the referee's findings and conclusions were clearly erroneous. *In re Schmidt*, 402 N.W.2d 544, 545 (Minn.1987). While this court places great weight on the disciplinary recommendations made by the referee, "the final responsibility for determining appropriate discipline rests solely with this court." *Id.*

█ We first consider the Director's argument that the referee erroneously concluded that Zotaley's submission of the PIP endorsement form to opposing counsel prior to arbitration, while misleading, did not violate Minn. R. Prof. Conduct 4.1 or 8.4(c). The Director asserts that Zotaley knew that the PIP endorsement form sent to opposing counsel was not Benkler's. The Director contends that because Zotaley emphasized to Benkler in a letter written the same day that an endorsement form from her records was critical to proving the existence of stacking, the failure to similarly inform opposing counsel was clearly deceptive. We agree with the Director's contention.

Minn. R. Prof. Conduct 4.1 provides that "[i]n the course of representing a client, a lawyer shall not knowingly make a false statement of fact or law." Minn. R. Prof. Conduct 8.4(c) states that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." On the day Zotaley submitted the PIP endorsement form to opposing counsel, Zotaley had evidence before him that Benkler had stacking coverage, based in part on the Company's payment of stacking benefits prior to Zotaley's involvement with the case and the Company's failure to provide either Zotaley or Benkler with any evidence that Benkler did not have stacking coverage. Zotaley also knew that Benkler had opted for coverage in excess of statutorily required minimums. However, while such knowledge might have led Zotaley to believe that Benkler had stacking coverage, Zotaley's subjective belief does not excuse his failure to inform opposing counsel of the source of a critical document. As stated in the comment to Minn. R. Prof. Conduct 3.3, "[t]here are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." We conclude that Zotaley's submission of the PIP endorsement form to opposing counsel, without revealing its source, while not a "false statement of fact or law" pursuant to Minn. R. Prof. Conduct 4.1, was in violation of Minn. R. Prof. Conduct 8.4(c).

█ We next consider Zotaley's argument that the referee erroneously concluded that Zotaley's submission of the PIP endorsement form to opposing counsel and the arbitrator, without explicitly informing them of the source of the document, along with the deceptive manner in which the form was submitted, violated Minn. R. Prof. Conduct 3.3(a)(4); 8.4(c); and 8.4(d). We agree with the referee's conclusion.

Minn. R. Prof. Conduct 3.3(a)(4) provides that a lawyer should not knowingly offer "evidence he knows to be false." Minn. R. Prof. Conduct 8.4(c) and 8.4(d) establish that it is professional misconduct for a lawyer to engage in conduct "involving dishonesty, fraud, deceit or misrepresentation" or "preju-

dicial to the administration of justice." Zotaley argues that it is logically inconsistent for the referee to conclude that Zotaley's claim at the arbitration hearing that Benkler had stacking was not frivolous, and that Zotaley offered evidence he "kn[ew] to be false" in violation of Minn. R. Prof. Conduct 3.3(a)(4).

However, Zotaley's belief that Benkler had stacking was premised on reasons independent of the endorsement form, which he knew was not Benkler's. While Zotaley's *claim* of the existence of stacking benefits was not frivolous, the specific evidence submitted in support of that claim was misleading. Zotaley violated Minn. R. Prof. Conduct 8.4(c) because he misrepresented the source of the PIP endorsement form to both opposing counsel and the arbitrator. Such misrepresentation also was "prejudicial to the administration of justice" because this court has long held that attorneys owe a duty of candor to the courts: "An attorney who deliberately deceives the court is guilty not only of obstructing the administration of justice but also of subverting that loyalty to the truth without which he cannot be a lawyer in the real sense of the word." *In re Nilva*, 266 Minn. 576, 583, 123 N.W.2d 803, 809 (1963); *see also Schmidt*, 402 N.W.2d at 548–49. However, although the evidence submitted in support of Benkler's claim was clearly misleading, it was not necessarily false. For this reason, we conclude that while Zotaley did not violate Minn. R. Prof. Conduct 3.3(a)(4), he did violate Minn. R. Prof. Conduct 8.4(c) and 8.4(d).

■ We also consider Zotaley's argument that the referee erroneously concluded that his failure to take remedial action after learning of the basis of the arbitrator's decision violated Minn. R. Prof. Conduct 3.3(a)(4). That rule provides that if "a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures." Zotaley points out that the arbitrator made his decision on May 13, 1993. On June 5, 1993, the parties entered into a settlement agreement for the amount awarded by the arbitrator. Zotaley asserts that he did not speak with the arbitrator until after the settlement agreement, and argues that once the parties entered the settlement agreement, the arbitrator's decision was effectively rendered moot. Because the arbitrator's decision was no longer binding, Zotaley claims that he cannot be disciplined for failing to take remedial action.

Zotaley's argument lacks merit because it ignores that Zotaley should have informed the arbitrator that the PIP endorsement form was not Benkler's after learning of the basis of the arbitrator's decision. The purpose of Minn. R. Prof. Conduct 3.3(a)(4), which requires "reasonable remedial measures," would be subverted if compliance with the rule depends on the fortuity of the ultimate resolution of the case, be it settlement, an arbitrator's decision, or a court order. Regardless of the outcome of the case, Zotaley was required under Minn. R. Prof. Conduct 3.3(a)(4) to take the remedial measure of informing the arbitrator of the source of the PIP endorsement form.

We now turn to the question of the appropriate discipline. The referee recommended that Zotaley be publicly reprimanded. The Director recommends a suspension of six months. Zotaley submits that the petition for disciplinary action should be dismissed, but if discipline is to be imposed, it should be limited to the public reprimand recommended by the referee.

■ To determine the appropriate sanction for particular misconduct, the court must consider the nature of the misconduct, the cumulative weight of the violations of the Rules of Professional Conduct, the harm to the public, and the harm to the legal profession. *In re Perry*, 494 N.W.2d 290, 292–93 (Minn.1992). The determination of the appropriate measure of discipline for an attorney is necessarily subjective. Because each case involves a different factual setting, different violations and mitigating or aggravating circumstances, prior disciplinary law is helpful only through analogy and the facts of each individual case must be carefully examined. *In re Boyd*, 430 N.W.2d 663, 664–65 (Minn.1988).

■ Although some would find fault with Zotaley's use of the endorsement form taken from another client's file, we recognize that the submission of a generic form or a form

taken from a central file is often done in insurance arbitration. Zotaley's error arose not from the use of the form, but from the failure to inform opposing counsel and the arbitrator of the source of the form and the misleading way the form was used throughout the litigation. This was a serious disciplinable offense. Zotaley engaged in a three-month course of deception during which he should have informed opposing counsel and the arbitrator that the document he was relying on as his principal piece of evidence was taken from another client's file. We highlight at least five occasions when Zotaley should have disclosed the source of the form: when he wrote the letter to Jensen; when he submitted his statement of the case to the arbitrator; at the arbitration hearing; when the arbitrator issued his decision; and when he discussed the case with the arbitrator. In light of the serious, persistent and protracted nature of Zotaley's misconduct, we conclude that a six-month suspension is the appropriate sanction.

We imposed a six-month suspension in *Schmidt*, where an attorney misrepresented facts to a judge, opposing counsel, and a client during the course of litigation and misrepresented facts to a client in order to secure a release absolving the lawyer from professional liability. 402 N.W.2d at 550. The court noted that while some of the misrepresentations "charitably might be viewed as oversights, clearly others * * * were patently false and in no way can be characterized as being unintentional or to have been made in good faith." *Id.* at 548. Zotaley's conduct cannot be viewed as an oversight, for he failed to inform opposing counsel of the source of the PIP endorsement form on the same day that he informed his client that the form was taken from another client's file. He also later failed to inform the arbitrator of the source of the form even after discovering that the arbitrator based his decision on the incorrect PIP endorsement form. Zotaley's conduct thus cannot be characterized as "being unintentional or to have been made in good faith." *Id.*

We also find support in the case of *In re Jagiela*, where we imposed a six-month suspension for drafting a backdated document,

submitting that document to opposing counsel and to the court, misrepresenting the document in pleadings, and failing to correct false deposition and trial testimony concerning the document. 517 N.W.2d 333, 336 (Minn.1994). Further, in *Jagiela* the court observed that there was clear and convincing evidence of Jagiela's misconduct because Jagiela did not inform the court or opposing counsel of the back-dating of the agreement. *Id.* at 335. In this case, Zotaley submitted the PIP endorsement form to opposing counsel and the arbitrator, misrepresented the document in his statement of the case and at arbitration, and failed to correct the arbitrator's decision, which decision was based on the mistaken belief that the form was Benkler's actual PIP endorsement. Zotaley's conduct thus fits squarely within *Jagiela* and supports the imposition of a six-month suspension.

We conclude that the appropriate sanction for Zotaley's conduct is a six-month suspension. Accordingly, we order:

1. That respondent, Byron L. Zotaley, is hereby suspended from the practice of law for six months, commencing 14 days from the date of this order;

2. That respondent comply with the requirements of Rule 26, Rules on Lawyers Professional Responsibility;

3. That respondent shall pay to the Director the sum of $750 in cost and disbursements pursuant to Rule 24, Rules on Lawyers Professional Responsibility.

We waive the requirement of a petition for reinstatement under Rule 18, Rules on Lawyers Professional Responsibility.

So ordered.

ANDERSON, Justice (concurring in part and dissenting in part).

I concur with the majority's depiction of Zotaley's misconduct. Zotaley had numerous opportunities over a three-month period to inform opposing counsel and the arbitrator of the source of the PIP endorsement form, but he failed to do so. However, I write separately because I believe imposition of a six-month suspension is not supported by prior cases decided by this court.

Due process requires that the sanction imposed in a discipline case be consistent with the sanction imposed in similar cases. We do not impose a heavier sanction due to the status of the attorney, nor do we impose a lighter sanction due to the fear of the deleterious effects on the attorney's career. Rather, we seek an evenhanded approach, determining the appropriate measure of discipline based upon the particular professional misconduct in the case before us and the precedent provided by the sanctions we have previously imposed in analogous cases.

The majority cites *Schmidt* as support for the imposition of a six-month suspension because the attorney in *Schmidt* misrepresented facts to a judge, opposing counsel, and a client during the course of litigation, and also misrepresented facts to a client in order to secure a release absolving the lawyer from professional responsibility. *In re Schmidt,* 402 N.W.2d 544, 550 (Minn.1987). These facts alone distinguish *Schmidt* from the present case because Zotaley cooperated with the disciplinary investigation and committed no further misconduct in an attempt to thwart the Director's investigation.

But the majority's focus on the misrepresentation in *Schmidt* also obscures other professional misconduct in that case which warranted a six-month suspension. The attorney in *Schmidt* grossly neglected his client, letting the statute of limitations run so that his client lost whatever rights he had to recover for damages in a personal injury action relating to the loss of his arm. *Id.* at 549. The lawyer's misconduct also did not "arise out of an isolated nor aberrant action," but was reflective of two prior disciplinary warnings for the neglect of client matters. *Id.* at 550.

The majority's reliance on *Jagiela* is similarly misplaced. *In re Jagiela,* 517 N.W.2d 333 (Minn.1994). The attorney in *Jagiela* participated in creating a document in 1990 that was not in existence in 1988. The document was then backdated as if it had been signed in 1988. *Id.* at 334. The backdated document was given to opposing counsel during litigation, submitted to the court, and testified to by the various parties, including the attorney's client, during the litigation. The attorney also filed briefs and other pleadings in which it was alleged that the backdated document had been executed in 1988. In an unrelated matter, the attorney gave false testimony in an affidavit used by another attorney in that attorney's divorce proceedings. *Id.*

A six-month suspension was appropriate in *Jagiela* because the attorney used a document he knew to be false. As the majority suggests, Zotaley could have avoided discipline by informing opposing counsel and the arbitrator of the source of the PIP endorsement form. No such remedy, and consequent avoidance of disciplinary action, would have been available had Zotaley backdated a document. The attorney's conduct in *Jagiela* also was more egregious because he allowed signatories to the document to give false testimony concerning it, and the attorney affirmatively argued that the document had been executed in 1988. *Id.* at 335. Moreover, the attorney's misconduct in connection with the backdated document was compounded by his false statements in the divorce affidavit. Zotaley, by contrast, implicated only himself through the use of the borrowed PIP endorsement form, and has committed no other professional misconduct other than that arising in the present case.

*Schmidt* and *Jagiela* thus provide weak support for the six-month suspension imposed by the majority. A six-month suspension based upon *Schmidt* and *Jagiela* is inappropriate because Zotaley's misconduct was less egregious than that in either of these two prior cases, he has never been previously sanctioned by this court, and has no known history of neglect of client matters or other professional misconduct. The record and the referee's findings support the conclusion that Zotaley's conduct was isolated and a departure from an otherwise unblemished 25–year legal career.

The referee recommended that the sanction be a public reprimand. In support of his recommendation, the referee concluded that Zotaley's professional misconduct did not "rise to the level" of that sanctioned in *Schmidt* and *Jagiela.* The referee specifically cited three analogous cases in which a 30–day suspension was imposed. *Matter of Dis-*

*cipline of Holmay,* 399 N.W.2d 564 (Minn. 1987); *Matter of Discipline of Kaminsky,* 407 N.W.2d 670 (Minn.1987); and *Disciplinary Action Against Mahoney,* 474 N.W.2d 598 (Minn.1991). The attorney in *Holmay* forged or procured the forgery of his client's signature on documents and falsely notarized them. He submitted the documents to the court and served them on the opposing party. 399 N.W.2d at 565. The attorney in *Kaminsky* forged a signature on three affidavits, made arrangements to have the affidavits notarized and then presented them to the court. The attorney was also found to have neglected a client matter. 407 N.W.2d at 670. In *Mahoney,* the attorney signed, directed or was responsible for the false dating, false recitations, false acknowledgments and false notarizations on documents which made it appear that the parties had executed the documents earlier than they actually had. These actions enabled the attorney's client to receive rental reimbursement to which he was not entitled. 474 N.W.2d at 598–99.

The referee concluded that Zotaley's actions were more serious than those in *Holmay* and *Kaminsky,* but less serious than those in *Mahoney,* except that Zotaley had permitted the endorsement form to be submitted to a tribunal and failed to take corrective action. Accordingly, the referee concluded that a 30–day suspension would be appropriate but for the unique facts of Zotaley's case and certain mitigating factors. The referee found the following mitigating factors: the insurance company's payment of stacking benefits prior to Zotaley's involvement; failure of Benkler's insurance agent to provide the endorsement form with the summary of coverage; failure of the insurance company's attorney to provide a copy of the PIP endorsement form showing no stacking which the insurance company claimed was part of Benkler's policy; and the claim of the insurance company's attorney that Benkler had signed a form declining stacking coverage, but his failure to produce such a form.

I agree with the referee's conclusion that *Schmidt* and *Jagiela* do not support a six-month suspension and that *Holmay, Kaminsky* and *Mahoney* do provide some support for a 30–day suspension. However, I conclude that neither a public reprimand, as recommended by the referee, nor a 30–day suspension is appropriate. Because Zotaley's actions were more serious than those sanctioned in *Holmay* and *Kaminsky* and were of about the same magnitude of those in *Mahoney,* and because I give much less weight to the unique facts of this case and the mitigating factors than did the referee, I would impose a suspension of 60 days.

TOMLJANOVICH, J., joins in the concurrence in part and dissent in part of Anderson, J.